F I L E D
United States Court of Appeals
Tenth Circuit

NOV 12 2004

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

O CENTRO ESPIRITA
BENEFICIENTE UNIAO DO
VEGETAL, also known as Uniao do
Vegetal (USA), Inc., a New Mexico
corporation on its own behalf and on
behalf of all its members in the United
States; JEFFREY BRONFMAN,
individually and as President of
UDV-USA; DANIEL TUCKER,
individually and as Vice-President of
UDV-USA; CHRISTINA BARRETO,
individually and as Secretary of
UDV-USA; FERNANDO BARRETO,
individually and as Treasurer of
UDV-USA; CHRISTINE BERMAN;
MITCHEL BERMAN; JUSSARA DE
ALMEIDA DIAS, also known as
Jussara Almeida Dias; PATRICIA
DOMINGO; DAVID LENDERTS;
DAVID MARTIN; MARIA EUGENIA
PELAEZ; BRYAN REA; DON ST.
JOHN; CARMEN TUCKER; SOLAR
LAW, individually and as members of
UDV-USA,

        Plaintiffs - Appellees,

    v.

JOHN ASHCROFT, Attorney General
of the United States; ASA
HUTCHINSON, Administrator of the
United States Drug, Enforcement

No. 02-2323

Administration; PAUL H. O'NEILL, Secretary of the Department of Treasury of the United States; DAVID C. IGLESIAS, United States Attorney for the District of New Mexico; DAVID F. FRY, Resident Special Agent in Charge of the United States Customs Service Office of Criminal Investigation in Albuquerque, New Mexico; all in their official capacities,

        Defendants - Appellants,

CHRISTIAN LEGAL SOCIETY; THE NATIONAL ASSOCIATION OF THE EVANGELICALS; CLIFTON KIRKPATRICK, as the Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.); QUEENS FEDERATION OF CHURCHES,

        Amicus Curiae.

**ON REHEARING EN BANC**
**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV-00-1647 JP/RLP)**

Gregory G. Katsas, Deputy Assistant Attorney General (David C. Iglesias, Attorney General, Peter D. Keisler, Assistant Attorney General, Michael Jay Singer, Attorney, Department of Justice and Matthew M. Collette, Attorney, Department of Justice with him of the briefs), of the Department of Justice, Washington, D.C., for Defendants-Appellants.

John W. Boyd (Nancy Hollander with him on the brief), of Freedom, Boyd, Daniels, Hollander, Goldberg & Cline, P.A., Albuquerque, New Mexico for Plaintiffs-Appellees.

Gregory S. Baylor, Nathan A. Adams, Kimberlee W. Colby, of Center for Law and Religious Freedom, Christian Legal Society, Annandale, Virginia, filed an amicus curiae brief on behalf of Plaintiffs-Appellees.

---

Before **TACHA,** Chief Judge, **SEYMOUR, PORFILIO, EBEL, KELLY, HENRY, BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN, McCONNELL,** and **TYMKOVICH,** Circuit Judges.

---

**PER CURIAM**.

---

## I.

This matter is before the *en banc* court to review issues emanating from the panel opinion in *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 342 F.3d 1170 (10th Cir. 2003). The panel affirmed a preliminary injunction, granted under the Religious Freedom Restoration Act ("RFRA"), which enjoined the United States from relying on the Controlled Substances Act ("CSA") and the United Nations Convention on Psychotropic Substances ("Convention") to prohibit the sacramental use of *hoasca* by Uniao do Vegetal and its members (collectively "UDV"). This court granted rehearing to review the different standards by which we evaluate the grant of preliminary injunctions, and to decide how those standards should be applied in this case.

## II.

The underlying facts relating to the parties and the issues are fully described in the panel opinion and are therefore unnecessary to reiterate here. UDV invoked RFRA, 43 U.S.C. § 2000bb-1, to obtain declaratory and injunctive relief which would prevent the government from prohibiting UDV's importation, possession, and use of *hoasca* for religious purposes and from attempting to seize the substance or prosecute individual UDV members.[1] After an evidentiary hearing, the district court granted UDV's motion for a preliminary injunction pending a decision on the merits. The government appealed that decision, the panel affirmed, and we granted the *en banc* petition.[2]

## III.

The *en banc* court is divided over the outcome of this case. Nevertheless, a majority of the court has voted to maintain a heightened standard for granting any of the three historically disfavored preliminary injunctions. A different majority

---

[1]*Hoasca* is a liquid tea-like mixture made from the plants psychotria viridis and banisteriposis caapi. These plants are indigenous to Brazil. Psychotria viridis contains dimethyltryptamine (DMT), which is listed on Schedule I of the CSA and the Convention.

[2]This court granted an emergency stay of the preliminary injunction pending appeal. *See* O *Centro Espirita v. Ashcroft*, 314 F.3d 463 (10th Cir. 2002).

has voted to affirm the district court's entry of a preliminary injunction in this case.

**A.  Standards for Granting Disfavored Preliminary Injunctions**

In *SCFC ILC, Inc. v. Visa USA, Inc.*, this court identified the following three types of specifically disfavored preliminary injunctions and concluded that a movant must "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issued": (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.  936 F.2d 1096, 1098-99 (10th Cir. 1991). With one important alteration, a majority of the *en banc* court has voted to affirm the core holding of *SCFC ILC*.  Part I of the Opinion of Murphy, J., joined by Ebel, Kelly, Hartz, O'Brien, McConnell, and Tymkovich, JJ.; Part I of the Opinion of McConnell, J, joined by Hartz, O'Brien, and Tymkovich, JJ.  Thus, if a movant seeks a preliminary injunction that falls into one of the three categories identified in *SCFC ILC*, the movant must satisfy a heightened burden.  The *en banc* court does, however, jettison that part of *SCFC ILC* which describes the showing the movant must make in such situations as "heavily and compellingly." *SCFC ILC*, 936 F.2d at 1098.  Instead, the *en banc* court holds that courts in this

Circuit must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard.

**B. Grant of Preliminary Injunction in this Case**

Although the reasons vary, a majority of the *en banc* court is of the view that the district court's entry of a preliminary injunction in this case should be affirmed. Part II of Opinion of Seymour, J., joined by Tacha, C.J., and Porfilio, Henry, Briscoe, Lucero, McConnell, and Tymkovich, JJ.; Part II of the Opinion of McConnell, J., joined by Tymkovich, J.

**IV.**

The decision of the United States District Court for the District of New Mexico to grant UDV's request for a preliminary injunction is hereby

**AFFIRMED**.  The temporary stay of the district court's preliminary injunction issued by this court pending resolution of this appeal is vacated.

No. 02-2323, *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*

**MURPHY**, Circuit Judge, joined in full by **EBEL**, **KELLY**, and **O'BRIEN**, Circuit Judges, and as to Part I by **HARTZ**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges, concurring in part and dissenting in part.

I agree with the *per curiam* opinion that a movant for a preliminary injunction must make a heightened showing when the requested injunction will alter the status quo. As set out more fully below, such an approach is completely consistent with the historic purpose of the preliminary injunction. Accordingly, I join parts I, II, and III.A of the *per curiam* opinion. I must respectfully dissent, however, from the conclusion that O Centro Espirita Beneficiente Uniao do Vegetal ("UDV") has sufficiently shown its entitlement to a preliminary injunction prohibiting the United States from enforcing the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* As a direct result of the preliminary injunction embraced by the majority, the United States is placed in violation of the United Nations Convention on Psychotropic Substances, Feb. 21, 1971, 32 U.S.T. 543 (hereinafter the "Convention"). I thus dissent from parts III.B and IV of the *per curiam* opinion.

## I.

**A.  A Heightened Showing is Appropriate When the Requested Preliminary Injunction Would Alter the Status Quo**

The Supreme Court has observed "that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted); *accord SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." (citation omitted)); *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established.").  The Supreme Court has further indicated that the "limited purpose" of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Accordingly, courts should be hesitant to grant the extraordinary interim relief of a preliminary injunction in any particular case, but especially so when such an injunction would alter the status quo prior to a trial on the merits.

This court's precedents are in harmony with the sentiments expressed by the Supreme Court in *Mazurek* and *Camenisch*. In particular, this court has identified the following three types of disfavored preliminary injunction and concluded that a movant must make a heightened showing to demonstrate entitlement to preliminary relief: "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *SCFC ILC*, 936 F.2d at 1098-99. Because each of these types of preliminary injunction is at least partially at odds with the historic purpose of the preliminary injunction—the preservation of the status quo pending a trial on the merits—this court has held that to obtain such an injunction the movant must demonstrate that "on balance, the four [preliminary injunction] factors weigh heavily and compellingly in his favor." *Id.* at 1099.

The *en banc* court specifically reaffirms the central holding in *SCFC ILC* that a movant seeking a preliminary injunction which upsets the status quo must satisfy a heightened burden. In advocating the abandonment of this requirement, Judge Seymour suggests that requiring a heightened showing when a requested preliminary injunction would alter the status quo is inconsistent with the need to prevent irreparable harm and is inconsistent with the approaches taken by other

circuits. Opinion of Seymour, J., at 4-6. Neither assertion offers a convincing reason for abandoning the well-reasoned approach set out in *SCFC ILC*.

It is simply wrong to assert that the application of heightened scrutiny to preliminary injunctions which alter the status quo is inconsistent with the purpose of preliminary injunctions. The underlying purpose of the preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395; *see also* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2947, at 123 (2d ed. 1995) [hereinafter "Wright & Miller"] (noting that the purpose of the preliminary injunction is to assure that the non-movant does not take unilateral action which would prevent the court from providing effective relief to the movant should the movant prevail on the merits). Although the prevention of harm to the movant is certainly a purpose of the preliminary injunction, it is not the paramount purpose. *See* Wright & Miller § 2947, at 123 (noting that although the prevention of harm to the movant is an important factor to be considered in deciding whether to grant a preliminary injunction, the primary purpose for such an order is "the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act"). Because a preliminary injunction which alters the status quo is generally contrary to this traditional purpose, such an injunction deserves some form of heightened scrutiny. *See id.* § 2948, at 133-35 & n.11 (collecting cases for

-4-

proposition that "the purpose of the preliminary injunction is the preservation of the status quo and that an injunction may not issue if it would disturb the status quo"). Such an approach is supported by strong policy rationales.

Any injury resulting from a preliminary injunction that merely preserves the status quo is not a judicially inflicted injury. Instead, such injury occurs at the hands of a party or other extrajudicial influence. By contrast, an injury resulting from a preliminary injunction that disturbs the status quo by changing the relationship of the parties *is* a judicially inflicted injury. It is injury that would not have occurred but for the court's intervention and one inflicted before a resolution of the merits. Because the issuing court bears extra responsibility should such injury occur, it should correspondingly be particularly hesitant to grant an injunction altering the status quo unless the movant makes an appropriate showing that the exigencies of the case require extraordinary interim relief. It may be small consolation should the issuing court ultimately resolve the merits in favor of the non-moving party; at that point the non-moving party has often incurred significant costs as a result of abiding by the improvident preliminary injunction.[1] A plaintiff who was willing to live with the status quo before filing

---

[1]*See generally* Wright & Miller § 2947, at 123. According to Professor Wright,

> The circumstances in which a preliminary injunction may be granted are not prescribed by the Federal Rules. As a result, the

(continued...)

its complaint should meet a higher standard in order to have the court intervene with an injunction that alters the status quo. Judge Seymour's approach, which seeks to elevate the importance of irreparable harm at the expense of the status quo, is inconsistent with the historic underpinnings of the preliminary injunction.

Nor is the failure of other courts to adequately distinguish between mandatory injunctions and injunctions that alter the status quo a sufficient reason to abandon *SCFC ILC*. *See* Opinion of Seymour, J., at 4 & n.1. In asserting that preliminary injunctions which alter the status quo should not be an independent disfavored category, Judge Seymour relies heavily on the fact that in cataloging the types of disfavored injunctions, no other court has chosen to specifically distinguish between preliminary injunctions which alter the status quo and

---

[1](...continued)
grant or denial of a preliminary injunction remains a matter for the trial court's discretion, which is exercised in conformity with historic federal equity practice. Although the fundamental fairness of preventing irremediable harm to a party is an important factor on the preliminary injunction application, the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act. On the other hand, judicial intervention before the merits have been finally determined frequently imposes a burden on defendant that ultimately turns out to have been unjustified. Consequently, the preliminary injunction is appropriate whenever the policy of preserving the court's power to decide the case effectively outweighs the risk of imposing an interim restraint before it has done so.

*Id.* (footnotes omitted).

preliminary injunctions which are mandatory. *Id.* None of the cases cited by Judge Seymour, however, contain any discussion of this question. Instead, those cases simply note, almost reflexively, that any preliminary injunction which alters the status quo is a mandatory injunction and, thus, subject to heightened scrutiny. *Id.* (collecting cases). The reflexive equation of preliminary injunctions which alter the status quo with mandatory injunctions by the courts cited by Judge Seymour is simply not a compelling justification to abandon the reasoned approach from *SCFC ILC*.

In any event, it is certainly true that courts have historically applied a more stringent standard to mandatory preliminary injunctions for the very reason that those injunctions generally do alter the status quo. *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003); *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995); *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979). In fact, most courts decide whether a given preliminary injunction is "mandatory" or "prohibitory" by determining whether or not it alters the status quo. *See, e.g., Tom Doherty Assocs.*, 60 F.3d at 34; *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994); *Martinez v. Mathews*, 544 F.2d 1233, 1242-43 (5th Cir. 1976). For these courts, then, the question whether an injunction is mandatory or prohibitory is merely a proxy for the more significant

question whether an injunction alters the status quo. Thus, to the extent these two categories do overlap, it is indeed strange to keep the proxy while jettisoning the underlying consideration giving rise to that proxy. *See* Opinion of Seymour, J., at 4, 9-10 (advocating the abandonment of heightened scrutiny for injunctions which alter the status quo, while maintaining heightened scrutiny for mandatory injunctions).

There is good reason, however, to distinguish between mandatory injunctions and injunctions which alter the status quo and to treat both types as disfavored. As set out above, "[a] preliminary injunction that alters the status quo goes beyond the traditional purpose for preliminary injunctions, which is only to preserve the status quo until a trial on the merits may be had." *SCFC ILC*, 936 F.2d at 1099. Although mandatory injunctions also *generally* alter the status quo, that is not always the case. It is not at all difficult to envision situations where a mandatory injunction would preserve the status quo and a prohibitory injunction would alter the status quo. *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984) (noting that whether a mandatory or prohibitory injunction will maintain or alter the status quo depends on whether the status quo is a "condition of action" or a "condition of rest"). Without regard to whether a mandatory preliminary injunction alters the status quo, however, it is still appropriate to disfavor such injunctions "because they

affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *SCFC ILC*, 936 F.2d at 1099. Thus, it is simply incorrect to assert that there is perfect overlap between these two categories and that the concept of status quo should be folded into the question whether an injunction is mandatory or prohibitory. The fact that other courts have failed to recognize these subtle distinctions is simply no reason to abandon the three artfully drawn categories set out in *SCFC ILC*.

For these reasons, the court is correct in reaffirming the central holding in *SCFC ILC* that a movant seeking a preliminary injunction which upsets the status quo must satisfy a heightened burden. Nevertheless, the decision to jettison *SCFC ILC*'s "heavily and compellingly" language as the articulated standard for granting any of the three types of disfavored preliminary injunctions is appropriate. It is enough to note that courts in this Circuit should recognize that each of the three types of injunction identified above is disfavored and that a request for such an injunction should be even more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is certainly extraordinary. *See Enter. Mgmt. Consultants*, 883 F.2d at 888 (holding that even a traditional injunction, i.e., an injunction which preserves the status quo, is an "extraordinary" and "drastic" remedy). Furthermore, because a preliminary

injunction that alters the status quo operates outside the historic parameters for such interim relief, movants should not be able to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, in addition to making a strong showing that the balance of the harms tips in its favor and that the preliminary injunction is not adverse to the public interest, a movant seeking a preliminary injunction that alters the status quo should always have to demonstrate a substantial likelihood of success on the merits.[2]

## B. The Status Quo in This Case is the Enforcement of the CSA and Compliance with the Convention

The status quo *in fact* in this case is the enforcement of the CSA and compliance with the Convention. The record is clear that both UDV itself and the United States recognized that the importation and consumption of *hoasca* violated the CSA. UDV made a concerted effort to keep secret its importation and use of

---

[2]Judge Seymour is simply incorrect in implying that the application of heightened scrutiny to preliminary injunctions that alter the status quo is inconsistent with the need to prevent irreparable harm. Opinion of Seymour, J., at 6-7. Instead, such an approach recognizes that preliminary injunctions which alter the status quo, an unconventional and historically disfavored type of interim relief, are far more likely to impose untoward costs on the non-moving party. For that reason, and because of the attendant costs imposed on the judiciary by such preliminary injunctions, it is appropriate to require that movants make a heightened showing as a predicate to obtaining a preliminary injunction which alters the status quo. Such a system is sufficiently flexible to allow courts to grant a preliminary injunction which alters the status quo when the harm to the movant is clear, certain, and irreparable; the balance of harms undoubtedly tips in favor of the movant; and the movant demonstrates a substantial likelihood of success on the merits.

-10-

*hoasca*. On the relevant import forms, UDV officials in the United States generally referred to *hoasca* as an "herbal tea"; they never called it *hoasca* or ayahuasca or disclosed that it contained DMT. UDV president Jeffrey Bronfman informed customs brokers that the substance being imported was an "herbal extract" to be used by UDV members as a "health supplement." Furthermore, in an e-mail drafted by Bronfman, he emphasized the need for confidentiality regarding UDV's "sessions" involving *hoasca*: "Some people do not yet realize what confidentiality is and how careful we need to be. People should not be talking publicly anywhere about our sessions, where we have them and who attends them." When UDV attempted to grow psychotria viridis and banisteriopsis caapi[3] in the United States, it imported the seeds and plants "clandestinely," in the words used by UDV, and required its members to sign confidentiality agreements to keep their attempts secret. All of these actions by UDV demonstrate a recognition that its importation and consumption of *hoasca* violated the CSA. Likewise, when the United States realized that UDV was importing a preparation which contained DMT, it seized that shipment and additional quantities of the preparation found in a search of Bronfman's residence. Accordingly, although UDV eventually sought a preliminary injunction after the seizure of the *hoasca*, at all times leading up to that event the

---

[3]These are the two plants utilized to brew *hoasca*.

-11-

record reveals that the status quo was the enforcement of the CSA. Where one party, here UDV, intentionally precludes a contest by concealing material information, the status quo must be determined as of the time all parties knew or should have known all material information.

Although recognizing that UDV "acted in a somewhat clandestine manner in the course of importing the *hoasca* and using it in its religious ceremonies," Judge Seymour nevertheless asserts that UDV's importation and use of *hoasca* is still the status quo because UDV's actions were "premised on its firmly held belief that such religious activity was in fact protected from government interference by its right to the free exercise of its religion." Opinion of Seymour, J., at 19 n.3. It is odd, indeed, to assume that UDV thought its actions were entirely lawful and protected by the Religious Freedom Restoration Act ("RFRA") or the First Amendment, in light of the fact that all of its actions were taken in secret. In any event, UDV's reason for doing what it was doing is irrelevant. It simply cannot be the case that a party can establish the status quo in a given case through secretive or clandestine activity. There is enough natural incentive to manipulation in events preceding litigation, and in litigation itself, without providing judicial endorsement of surreptitious conduct by wrapping it in a cloak of "status quo." The "last peaceable uncontested status existing between the parties before the dispute developed," 11A Wright & Miller § 2948, at 136, is

-12-

most surely the open and notorious actions of the parties before the dispute. Here, it is uncontested that the open and notorious actions of UDV were a facade of compliance with the CSA. Thus, the status quo in this case is the government's enforcement of the CSA.

What is most strange about the approach advocated by Judge Seymour is its apparent reliance on the legal rights of the parties in arriving at the status quo in this case. Although disclaiming such an approach, Opinion of Seymour, J., at 18, Judge Seymour specifically references the parties' legal rights in determining the status quo in this case. *Id.* ("[W]e are faced with a conflict between two federal statutes, RFRA and the CSA, plus an international treaty, which collectively generate important competing status quos."). If the status quo is both parties exercising their legal rights, but the mutual and contemporaneous exercise of those rights is factually impossible, then the status quo must instead be the exercise of legal rights by only one party. Judge Seymour has not cited a single case to support the assertion that status quo is determined by reference to a party's legal rights. Furthermore, such an approach is clearly inconsistent with this Circuit's historic understanding of what constitutes the status quo. *SCFC ILC*, 936 F.2d at 1100 ("The status quo is not defined by the [parties'] existing *legal rights*; it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships

-13-

may ultimately be found to be in accord or not in accord with the parties' legal rights."). Finally, such an approach is completely unhinged from the reality of the parties' extant relationship and from the historic purposes of the preliminary injunction. For instance, under Judge Seymour's view of what constitutes the status quo, it would not be determinative had the government at first knowingly acquiesced in UDV's consumption of *hoasca*, believing that such consumption was protected by RFRA, before eventually changing tack and deciding to enforce the CSA. Instead, under Judge Seymour's approach, a relevant consideration for status quo purposes is whether the government was at all times legally entitled to enforce the CSA.[4] This is clearly a question of whether UDV is likely to prevail on the merits. Thus, if a party is likely to prevail on the merits, Judge Seymour would label that merits analysis the status quo and then use it a second time to

---

[4]Likewise, envision two parties to a long-term contract. For a number of years both parties have operated with an identical understanding of a key provision of the contract. Party A suddenly changes course and adopts a different view of the contract. Facing irreparable injury, party B brings a declaratory judgment action and seeks a preliminary injunction to preserve the status quo pending resolution of the suit. Under Judge Seymour's approach, the parties' course of conduct would be irrelevant to the question of status quo. Instead, the status quo would be determined by the merits of the parties' legal assertions. That is, if the district court determined on a preliminary and incomplete record that party A was likely to prevail on the merits, the status quo would be party A's revised interpretation of the contract. Such an approach is surely at odds with any basic understanding of what constitutes the status quo.

reduce the movant's burden on the final three preliminary injunction factors. Such an approach lacks logical moorings.

## C.    Conclusion

In sum, a heightened standard is consistent with the historical underpinnings of the preliminary injunction and is supported by persuasive policy rationales. Furthermore, this court's delineation in *SCFC ILC* of three types of disfavored preliminary injunction is well-reasoned and consistent with the historic purpose of the preliminary injunction; *SCFC ILC* should not be completely abandoned simply because other courts have chosen a different course. The status quo in this case is the government's enforcement of the CSA and compliance with the Convention. Accordingly, when analyzing whether UDV is entitled to its requested preliminary injunction, this court will recognize that the requested injunction is disfavored and more closely scrutinize the request to assure that the exigencies of the case support the granting of a particularly extraordinary remedy.[5]

---

[5]As noted in the panel dissent, because the district court did not recognize that the requested preliminary injunction would change the status quo, it did not subject UDV's request to any special scrutiny. *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 342 F.3d 1170, 1190 (10th Cir. 2003) (Murphy, J., dissenting). The failure of the district court to apply the correct standard in evaluating UDV's request for a preliminary injunction amounts to an abuse of discretion. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.3d 1096, 1100 (10th Cir. 1991). Nevertheless, because the record on appeal is sufficiently well developed,

(continued...)

-15-

**II.**

Based heavily on the conclusion that UDV has demonstrated a substantial likelihood of success on the merits, a majority of the *en banc* court resolves that the district court did not err in granting UDV a preliminary injunction. In contrast to the conclusions of the majority, however, UDV has not demonstrated a substantial likelihood of success on the merits. First, RFRA was intended to restore the compelling interest test that existed before *Employment Division v. Smith*, 494 U.S. 872 (1990). 42 U.S.C. § 2000bb(b)(1). Employing that test, courts routinely rejected religious exemptions from laws regulating controlled substances and have continued to do so with RFRA. Second, one only need look to the congressional findings set out in the CSA to see that the United States carried its burden of demonstrating that the prohibition against importing or consuming *hoasca* furthers its compelling interests in protecting the health of UDV members and preventing diversion of *hoasca* to non-religious uses. Finally, compliance with the Convention, which results in international cooperation in curtailing illicit drug trafficking, is certainly a compelling interest. The record

[5](...continued)
it is appropriate for this court to determine in the first instance whether UDV has met the requisite burden. *O Centro Espirita*, 342 F.3d at 1190 (Murphy, J., dissenting) (citing *SCFC ILC*, 936 F.2d at 1100).

further indicates that absent strict compliance with the Convention, the United States' efforts in this regard would be hampered.

Quite aside from the question of whether UDV has demonstrated it is substantially likely to prevail on the merits, UDV has not demonstrated its entitlement to a preliminary injunction. In connection with the risk to the health of UDV members and the risk to the public from diversion of *hoasca*, the district court found the evidence respectively "in equipoise" and "virtually balanced." The district court did not proceed to even address the harm to the government and the public interest resulting from violations of the Convention necessitated by its injunction. With the evidence in this state, UDV has not carried its burden of demonstrating that the third and fourth preliminary injunction factors—that the threatened injury to it outweighs the injury to the United States under the preliminary injunction and that the injunction is not adverse to the public interest—weigh in its favor thereby justifying even a preliminary injunction that does not alter the status quo. Superimposing the more appropriate heightened scrutiny for a disfavored injunction altering the status quo upon the evidence in this case renders the preliminary injunction even more decidedly erroneous.

## A. Substantial Likelihood of Success on the Merits

### 1. Controlled Substances Act

RFRA was never intended to result in the kind of case-by-case evaluation of the controlled substances laws, and the scheduling decisions made pursuant to those laws, envisioned by the majority. In light of the specific findings set out in the CSA with regard to the drug at issue here, it is particularly improper for the court to assume such a function in this case. This is true even though limited religious use of another drug, peyote, has been allowed pursuant to statute, 42 U.S.C. § 1996a, and before that, pursuant to regulation, 21 C.F.R. § 1307.31. Apart from the fact that courts should not direct the nation's drug policy, courts simply lack the institutional competence to craft a set of religious exemptions to the uniform enforcement of those laws. In contrast to the majority's conclusion, RFRA does not compel such an approach.

To the extent that RFRA requires the government to prove a compelling governmental interest and least restrictive means concerning the ban on DMT, *see* 42 U.S.C. § 2000bb-1(b), the government need turn only to express congressional findings concerning Schedule I drugs. Congress specifically found that these drugs have a high potential for abuse, have no currently accepted medical use, and are not safe for use under any circumstances. 21 U.S.C. § 801(2) ("The illegal importation, manufacture, distribution, and possession and improper use of

controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."); *id.* § 801a(1) ("The Congress has long recognized the danger involved in the manufacture, distribution, and use of certain psychotropic substances . . . , and has provided strong and effective legislation to control illicit trafficking and to regulate legitimate uses of psychotropic substances in this country."). As to the specific drug at issue here, DMT, Congress has found that it has high potential for abuse and is not safe to consume even under the supervision of medical personnel. *Id.* § 812(b)(1) (setting out findings required for placement of a drug on Schedule I); *id.* § 812(c), sched. I(c)(6) (including DMT, dimethyltryptamine, within Schedule I). These congressional findings speak to a need for uniformity in administration given the serious problem of drug abuse in the United States. *See Smith*, 494 U.S. at 905 (O'Connor, J., concurring); *United States v. Israel*, 317 F.3d 768, 771 (7th Cir. 2003).

RFRA ought not result in a case-by-case redetermination of whether these findings are correct. Judge McConnell takes the opposite position—that congressional findings and scheduling (indeed Congress scheduled DMT) are not enough—stating "[s]uch generalized statements are of very limited utility in evaluating the specific dangers of *this* substance under *these* circumstances, because the dangers associated with a substance may vary considerably from

-19-

context to context." Opinion of McConnell, J., at 25. Judge McConnell's opinion suffers from two serious defects.

First, the opinion is simply wrong in asserting that the findings in the CSA are too generalized to have any utility in determining whether the use of DMT in a religious setting is dangerous to the health of UDV practitioners. On this point, Congress could not have been more clear. DMT has a high potential for abuse and is not safe to consume *under any circumstances, even including under the supervision of medical personnel*. 21 U.S.C. § 812(b)(1), (c), sched. I(c)(6).

Second, under the approach advocated by Judge McConnell, whether this court is talking about drinking *hoasca* tea (ingesting DMT), smoking marijuana, or shooting heroin (Judge McConnell's example), the government will be required to investigate religious use and determine whether the health risks or possibility of diversion would outweigh free exercise concerns. Such a reading of RFRA is difficult to reconcile with RFRA's purpose of merely reviving the pre-*Smith* compelling interest test. 42 U.S.C. § 2000bb(b)(1). Congress viewed that test as applied in prior federal rulings as "a workable test for striking sensible balances between religious liberty and competing prior governmental interests." *Id.* § 2000bb(a)(5). Employing that test, courts routinely rejected religious exemptions from laws regulating controlled substances. *See United States v. Greene*, 892 F.2d 453, 456-57 (6th Cir. 1989); *Olsen v. DEA*, 878 F.2d 1458,

1462-63 (D.C. Cir. 1989); *Olsen v. Iowa*, 808 F.2d 652, 653 (8th Cir. 1986); *United States v. Rush*, 738 F.2d 497, 512-13 (1st Cir. 1984); *United States v. Middleton*, 690 F.2d 820, 824 (11th Cir. 1982). They have continued to do so with RFRA. *See Israel*, 317 F.3d at 772; *United States v. Brown*, No. 95-1616, 1995 WL 732803, at *2 (8th Cir. Dec. 12, 1995) (per curiam); *United States v. Jefferson*, 175 F. Supp. 2d 1123, 1131 (N.D. Ind. 2001). Though these cases involve marijuana, the same result should obtain in this case.[6]

Judge McConnell's view of how RFRA operates seems to overlook events leading up to the passage of RFRA. It is certainly true, as Judge McConnell notes, that RFRA was passed in response to the Supreme Court's decision in *Smith* and that *Smith* did happen to involve the sacramental use of peyote. Opinion of McConnell, J., at 21 ("[T]he impetus for enactment of RFRA was the

---

[6]Judge McConnell asserts that these precedents provide no insight into the proper result in this case because the use of DMT (presumably only that DMT consumed in the form of *hoasca*) is not in widespread use and its sacramental use is "tightly circumscribed." Opinion of McConnell, J., at 21-22. Judge McConnell's view of religious freedom under RFRA is novel and problematic. Under his view, small religious groups are free to use "sacramental drugs," as long as those "sacramental drugs" are esoteric and are not used too frequently. Once the religious group becomes too successful at attracting adherents, its chosen "sacramental drug" becomes popular with the public at large, or it decides that its sacrament must be consumed too frequently, the government's interest becomes paramount. Unfortunately, he cites nothing from the legislative history of RFRA or from pre-*Smith* law to support the notion that the government has a lesser interest in regulating the sacramental drug use of small religious groups than it does in regulating the sacramental drug use of larger religious groups.

Supreme Court's decision in a case involving the sacramental use of a controlled

substance."). Judge McConnell is wrong to imply, however, that Congress

intended to alter the ultimate outcome of that case (states may, consistent with the

constitution, prohibit all uses, both religious and non-religious, of peyote), as

opposed to altering the analytical model set out in that case (no right in the Free

Exercise Clause to avoid neutral laws of general application). Opinion of

McConnell, J., at 21-23. A review of the findings accompanying RFRA makes

clear that Congress was concerned with the latter, not the former.[7] The

_____

[7]The Congressional findings accompanying RFRA provide as follows:

The Congress finds that—

> (1) the framers of the Constitution, recognizing free
> exercise of religion as an unalienable right, secured its
> protection in the First Amendment to the Constitution;
>
> (2) laws "neutral" toward religion may burden religious
> exercise as surely as laws intended to interfere with
> religious exercise;
>
> (3) governments should not substantially burden
> religious exercise without compelling justification;
>
> (4) in Employment Division v. Smith, 494 U.S. 872
> (1990) the Supreme Court virtually eliminated the
> requirement that the government justify burdens on
> religious exercise imposed by laws neutral toward
> religion; and
>
> (5) the compelling interest test as set forth in prior

(continued...)

-22-

procedural history preceding the enactment of RFRA does not support Judge McConnell's assertion that this court is free to ignore the congressional findings in the CSA in resolving UDV's RFRA claim.

Equally unconvincing is Judge McConnell's attempt to minimize the government's interest in the uniform enforcement of the CSA. Unlike compulsory education for an additional two years, the interest in enforcement of the nation's drug laws as prescribed by Congress is one of the highest order. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."). It directly affects the health and safety of American citizens. Unlike the protection of bald and golden eagle populations, the regulation of controlled substances can mean the difference between human life and death, and a court should not be second-guessing legislative and administrative determinations concerning drug scheduling based upon the record we have in this case. *See United States v. Szycher*, 585 F.2d 443, 444-45 (10th Cir. 1978); *see also Touby v.*

---

[7](...continued)
Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

42 U.S.C. § 2000bb(a).

*United States*, 500 U.S. 160, 162-163 (1991) (discussing time-consuming procedural requirements involved in drug scheduling). For these reasons, Judge McConnell's reliance on *Yoder* and *Hardman* is simply misplaced. Opinion of McConnell, J., at 23-24, 44-45.

Judge McConnell is likewise wrong to assert that the Attorney General has the raw power to grant religious exemptions from the Controlled Substances Act under the guise that it "is consistent with public health and safety." 21 U.S.C. § 822(d) (waiving registration requirements for certain manufacturers, distributors and dispensers if consistent with public health and safety); *Olsen*, 878 F.2d at 1466 app. (DEA Final Order) ("There is no mechanism for an exemption to scheduling for religious purposes."). The government's regulatory exemption for peyote, 21 C.F.R. § 1307.31, later enacted by statute, 42 U.S.C. § 1996a, was at all times a product of congressional will. *See Rush*, 738 F.2d at 513 (noting the "*sui generis* legal status of the American Indians"). The panel opinion recognized this when it rejected an equal protection argument that because the Native American Church's use of peyote is protected, so too should be the use of *hoasca*. *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 342 F.3d 1170, 1186 n.4 (10th Cir. 2003). The panel relied upon *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1216 (5th Cir. 1991), which held that an exemption for the Native American Church members to use peyote was rationally related to

-24-

the government's trust responsibility to preserve Native American culture. To read the exemption for the Native American Church as an indication that Congress and the Executive have not precluded "a particularized assessment of the risks involved in specific sacramental use" of controlled substances, Opinion of McConnell, J., at 25-27, proves too much—the concurring opinion can point to no other controlled substance receiving like treatment.

The CSA envisions careful scheduling of substances. *See* 21 U.S.C. § 811(c) (listing eight factors which Attorney General must consider before adding or removing a substance from schedules); *id.* § 812(b) (findings necessary for adding a substance to a schedule); *id.* § 811(a) (requirement of notice and a hearing before Attorney General may add or remove a substance from schedule). It also envisions medical and scientific uses of controlled substances in the public interest and consistent with public health and safety; "[n]either manufacturing, distribution or dispensing contemplates the possession of controlled substances for other than legitimate medical or research purposes." *Olsen*, 878 F.2d at 1466 app. (DEA Final Order); *see also* 21 U.S.C. § 823(a)-(b). Finally, the CSA allocates the burden of production in favor of the government: in any proceeding brought by the government under Title 21, the burden of going forward with evidence of any exemption or exception falls on the person claiming its benefit.

21 U.S.C. § 885(a)(1) (government is not required to negative any exemption or exception).

The careful approach of the CSA should be contrasted with that of this court. Although this court recognizes that "the interests of the government as well as the more general public are harmed if the government is enjoined from enforcing the CSA against the general importation and sale of street drugs, or from complying with the treaty," it then characterizes this case as one "about importing and using small quantities of a controlled substance in the structured atmosphere of a bona fide religious ceremony." Opinion of Seymour, J., at 22-23. Can the free exercise of religion under RFRA really turn on whether the adherent has a religious affinity for street drugs or more esoteric ones?[8]

---

[8]As noted above, Judge McConnell suggests that it can. According to his opinion, the strength of the government's interest in avoiding diversion of a controlled substance and enforcing the CSA will vary under RFRA depending on how esoteric the drug is, how often the drug is taken as a sacrament, the size of the religious group, and whether the drug is consumed in a traditional or non-traditional fashion. Opinion of McConnell, J., at 21-22, 27-28. With regard to this particular case, Judge McConnell presumes that in proscribing DMT Congress was only concerned with it being taken intravenously or being inhaled, not with oral ingestion. *Id.* at 27. No evidence supports this. In *United States v. Green*, 548 F.2d 1261 (6th Cir. 1977), a DEA chemist qualified as an expert witness testified to the hallucinogenic effects of DMT and its similarity in this respect to LSD, its dangerousness, and potential for abuse. *Id.* at 1269; *see also People v. Saunders*, 543 N.E.2d 1078, 1080 (Ill. App. Ct. 1989) (psychiatrist testimony that DMT is an hallucinogen and similar to LSD). Though the court reversed the conspiracy to manufacture convictions in *Green* because it found that such testimony had minimal probative value and was prejudicial concerning the
(continued...)

-26-

In light of the congressional purpose behind RFRA of reinstating the pre-*Smith* compelling interest test, 42 U.S.C. § 2000bb(b)(1), the routine rejection of religious exemptions from drug laws in the pre-*Smith* era, and the congressional findings undergirding the placement of DMT among the most dangerous and addictive of drugs (i.e., Schedule I substances), UDV has failed to demonstrate that it is likely to succeed on the merits of its claim that RFRA entitles it to freely import and dispense *hoasca*.

### 2. *United Nations Convention on Psychotropic Substances*

The United States argues convincingly that a preliminary injunction requiring it to violate the Convention could seriously impede its ability to gain the cooperation of other nations in controlling the international flow of illegal drugs. *See* 21 U.S.C. § 801a(1) ("Abuse of psychotropic substances has become a phenomenon common to many countries . . . and is not confined to national borders. It is, therefore, essential that the United States cooperate with other nations in establishing effective controls over international traffic in such

---

[8](...continued)
conspiracy charge, the court noted that "[s]uch facts may be highly relevant is assessing the need for controlling the drug." *Green*, 548 F.2d at 1270. Other DMT prosecutions may be found in *United States v. Ling*, 581 F.2d 1118 (4th Cir. 1978); *United States v. Noreikis*, 481 F.2d 1177 (7th Cir. 1973); *United States v. Moore*, 452 F.2d 569 (6th Cir. 1971). It is also noteworthy that New Mexico proscribes possession and possession with intent to distribute DMT (dimethyltryptamine). *See* N.M. Stat. Ann. §§ 30-31-6(C)(6), 30-31-20(B), 30-31-23(D).

substances.").[9]  The district court erroneously concluded that the Convention did not cover *hoasca*.  Judge McConnell does not appear to directly address the merits of the district court's conclusion, instead concluding that the government has failed to carry its burden under RFRA of demonstrating narrow tailoring.  Opinion of McConnell, J., at 29-33.  Judge Seymour, on the other hand, takes an entirely different tack.  In her separate opinion, she asserts that because the Convention includes a provision allowing "signatory nations to seek an exemption from the treaty for indigenous plants containing prohibited substances 'traditionally used by certain small, clearly determined groups in magical or religious rites,'" the government's "argument that it will be significantly harmed by a preliminary injunction temporarily restraining it from enforcing the treaty

---

[9]As was true of the panel majority, Judge Seymour asserts that the Convention "must be read in light of RFRA and the religious use of the controlled substance here."  Opinion of Seymour, J., at 24 & n.5 (citing *O Centro Espirita*, 342 F.3d at 1183-84).  As noted in the panel dissent, such an assertion could be read for the following two disturbing propositions: (1) the government's interest in complying with its obligations under the Convention is not compelling because these obligations conflict with the government's obligations under RFRA; and (2) because RFRA was enacted after the Convention was ratified, the Convention is nullified to the extent it conflicts with RFRA.  *O Centro Espirita*, 342 F.3d at 1191 n.4 (Murphy, J., dissenting).  The dissent further explained why both propositions are incorrect as a matter of law.  *Id*.  Unfortunately, Judge Seymour has carried the panel's error forward, again intimating that the terms of the Convention have somehow been amended by RFRA.  For those reasons set out in the panel dissent, Judge Seymour is wrong in asserting that RFRA has displaced or amended the Convention.  *Id*.

-28-

against the UDV does not ring entirely true." Opinion of Seymour, J., at 25. The district court, Judge McConnell, and Judge Seymour are all incorrect.

For those reasons set out in the panel dissent, *hoasca* is a preparation containing a Schedule I substance covered by the Convention. *O Centro Espirita*, 342 F.3d at 1192-93 (Murphy, J., dissenting). Article 7 of the Convention obligates signatory nations to prohibit all uses of Schedule I substances and to prohibit the import and export of those substances. Convention, *supra*, at 1, art. 7, 32 U.S.T. 543. The congressional findings in 21 U.S.C. § 801a(1) make clear that international cooperation and compliance with the Convention are essential in providing effective control over the cross-border flow of such substances. In addition, the record contains the declaration of Robert E. Dalton, a State Department lawyer for the Treaty Affairs Office. Dalton's declaration asserts that the need to avoid a violation of the Convention is compelling and that a violation of the Convention would undermine the United States' role in curtailing illicit drug trafficking. It appears that the Dalton declaration is unopposed. In light of the plain meaning of the Convention, the congressional findings on the importance of cooperation, and the Dalton declaration, UDV has not demonstrated a substantial likelihood that it will prevail on the merits of its RFRA claim.

In his separate opinion, Judge McConnell asserts that (1) the government deprived this court of "evidence" necessary to interpret the Convention and (2)

the government failed to demonstrate that strictly prohibiting the import and consumption of *hoasca* is the least restrictive means of furthering its interest in complying with the Convention. Opinion of McConnell, J., at 29, 30-33. Judge McConnell's assertions are flawed in several respects.

First and foremost, the interpretation of the Convention is a question of law. *See, e.g., Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 370 (2d Cir. 2004) (holding that proper interpretation of an international treaty is a question of law subject to *de novo* review); *United States v. Garrido-Santana*, 360 F.3d 565, 576-77 (6th Cir. 2004) (same); *United States v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004) (same); *Smythe v. United States Parole Comm'n*, 312 F.3d 383, 385 (8th Cir. 2002) (same). Here, the district court unequivocally concluded that the Convention did not apply to *hoasca*. For those reasons set out in the panel dissent, the district court's legal conclusion is erroneous. *O Centro Espirita*, 342 F.3d at 1192-93 (Murphy, J., dissenting). That the district court did not hold a hearing on this question, does not foreclose this court from recognizing the district court's legal error. When interpreting a treaty this court must "first look to its terms to determine its meaning." *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992). As set out in the panel dissent, and as elaborated *supra*, the plain language of the Convention makes clear that all signatories must prohibit the international trafficking of *hoasca*.

-30-

Based on its erroneous legal conclusion that the Convention did not apply to *hoasca*, the district court precluded the government from presenting evidence regarding the Convention at the evidentiary hearing. In a letter to the parties, the district court indicated as follows: "I have reviewed the parties' briefs on [UDV's] Motion for Preliminary Injunction. I believe that it will be necessary to hold an evidentiary hearing on the following factual issues: 1) the health risks associated with the ceremonial use of hoasca; 2) the potential for diversion of hoasca to non-ceremonial use . . . ." Of course, as noted above, whether *hoasca* is covered by the Convention is a question of law for the court to decide, not a question of fact like those questions identified by the district court in its letter. Thus, it is strange to assert, as does Judge McConnell, that it would be premature to reach this issue because the district court did not hold an evidentiary hearing on the matter. Opinion of McConnell, J., at 29.

Nor is it altogether accurate to assert that it was the defendants who opposed the introduction of evidence on this question at the hearing. *Id.* Judge McConnell asserts that UDV "attempted to present evidence regarding the interpretation of the Convention by the International Narcotics Control Board [("INCB")], the international enforcing agency, *including* a letter by the Secretary of the Board stating that hoasca is not controlled under the Convention." *Id.* (emphasis added). Judge McConnell makes it appear that UDV sought to produce

multiple items of evidence, only one component of which was a letter from the

Secretary of the INCB. In fact, UDV merely sought to question a witness about

the contents of Plaintiff's Exhibit 54, a letter from the Secretary of the INCB.

That letter had already been admitted into evidence and used by both UDV and

the government in questioning witnesses regarding the efficacy of the control

measures for Schedule I and II drugs under the Convention. Furthermore, as

noted by the government below, there are serious questions as to the relevance of

the Secretary's opinion regarding whether *hoasca* is covered by the Convention.

Judge McConnell further asserts that based on a narrow objection by the

United States, the district court excluded the evidence, depriving this court of

"interpretive history" necessary to a resolution of this appeal.[10] It is far from

clear, however, that Plaintiff's Exhibit 54 is as important as Judge McConnell

would assume, since neither party saw fit to include it in the record on appeal.

Nor is it accurate to assert that the sole basis of the government's objection to the

---

[10]According to Judge McConnell,
> The government objected on the ground that "We are now introducing testimony about whether or not ayahuasca is controlled under the International Convention. That is not one of the issues in this hearing." After discussion, the district court forbade the questioning on the subject, and plaintiffs were unable to introduce evidence on the interpretation of the Convention by the Board. For this Court to attempt to interpret a complex treaty on the basis of its "plain language," without the benefit of its interpretive history, would be premature."

Opinion of McConnell, J., at 29 (record citation omitted).

line of questioning was that the district court had not asked the parties to present evidence on the issue. Opinion of McConnell, J., at 29. Instead, the government objected on multiple grounds: (1) the questions were beyond the scope of redirect examination; (2) the letter was legally irrelevant; (3) the district court had previously informed the parties that no evidence would be taken on the Convention; and, most importantly, (4) whether *hoasca* is covered by the Convention was a legal question for the court to decide.[11] Taken in context, then,

_____

[11]During the discussion on whether the questioning should be allowed, counsel for the government stated as follows:

> Objection, Your Honor. We are now introducing testimony about whether or not ayahuasca is controlled under the International Convention. That is not one of the issue in this hearing.
>
> . . . .
>
> Your Honor, the person who introduced that exhibit was plaintiffs' counsel, who introduced it for the purpose of talking about the effectiveness of controls. I also was talking about the effectiveness of Schedule I and II controls. I did not talk about the applicability of the treaty to ayahuasca. That is not one of the issues here. That is a legal issue, and that is up to Your Honor to decide. . . .
>
> . . . .
>
> Your Honor, we did not just now talk about which substances were controlled in the Convention. When I went through this report, it was to rebut statements [plaintiffs' counsel] made from the report yesterday about the effectiveness of the controls. That is the only reason.
>
> The reason why we should not be talking about this today is because it is not an opinion of the INCB. The secretary of the board is not a voting member. The government does not agree or accept that the INCB doesn't control ayahuasca under the Convention. The INCB does not have the authority to determine what is controlled

(continued...)

-33-

it is not appropriate to hold the government responsible, as does Judge McConnell, for the district court's failure to hold a hearing on whether compliance with the Convention is a compelling governmental interest. *Id.*

Nor is it appropriate to fault the government for failing to demonstrate that strictly prohibiting the importation and consumption of DMT, in the form of *hoasca*, is the least restrictive way to further the government's interest in complying with the Convention. Opinion of McConnell, J., at 30. The problem, of course, is that the district court short-circuited the government's ability to present evidence on this particular question when it concluded that the Convention did not apply to *hoasca*. Under these circumstances, it seems strange to punish the government for this purported evidentiary deficiency. As we have it, the Dalton declaration is the only evidence in the record on the question and is uncontradicted. With the record in this state, UDV has failed to demonstrate a substantial likelihood of success on the merits.[12]

---

[11](...continued)
under the Convention. This is an entirely separate issue. It's a legal issue for another day. And this does not relate to diversion or anything I talked about just now.

[12]Even if Judge McConnell were correct that the record is too truncated to reach a decision on whether the government has advanced a compelling interest in complying with the Convention and that prohibition on the import and consumption of *hoasca* is the most narrowly tailored means of advancing that compelling interest, however, the more appropriate course of action would be to remand to the district court for further development of the record.

In response, Judge McConnell envisions an elaborate process whereby, to demonstrate narrow tailoring, the government is obligated to request that DMT be removed from the schedule of drugs covered by the Convention. Opinion of McConnell, J., at 30-31. That is, until the government seeks to have DMT removed from coverage by the Convention, it cannot demonstrate that "strict" prohibitions against the import of DMT are the least restrictive means of advancing its interest in complying with the Convention. It is worth noting at the outset that this argument is not advanced on appeal by UDV. In any event, Congress has specifically found that DMT is a highly dangerous and addictive substance. It is difficult to see how asking that DMT be removed from the schedule of drugs covered by the Convention advances the government's interests in any way. To the extent that Judge McConnell is implying that the government could seek an exemption allowing importation into and consumption of DMT in the United States, whether or not that DMT came in the form of *hoasca*, while the remaining signatories remain bound by the terms of the Convention to prevent international trafficking in DMT, his assertion finds absolutely no support in the language of Article 2. There is simply nothing in that particular Article allowing signatory nations to pick and choose which of the Scheduled drugs they will criminalize. It is certainly true that signatory nations can object to the scheduling of new psychotropic drugs and can ask that drugs already scheduled be

-35-

reclassified. Opinion of McConnell, J., 30-31. Those provisions do not,
however, allow for a single nation opt-out; instead, they establish the schedule of
drugs that all signatory nations will be obligated to criminalize. It is incongruous
to obligate the government to seek to remove DMT from the coverage of the
Convention in order to demonstrate that its efforts to restrict the importation and
consumption of DMT are the least restrictive means of complying with the
Convention.

Judge Seymour does not endorse the district court's conclusion that the
Convention does not apply to *hoasca*. Instead, she asserts that the availability of
the exemption in Article 32 of the Convention demonstrates that no significant
harm will flow to the government from the injunction. Opinion of Seymour, J., at
24-25; *see also* Opinion of McConnell, J., at 31-32 (asserting that the failure of
the government to seek a reservation under Article 32(4) on behalf of UDV
demonstrates the government failed to prove that the strict prohibition against the
importation and consumption of *hoasca* is the least restrictive means of furthering
its interest in complying with the Convention). What Judges Seymour and
McConnell fail to acknowledge, however, is that the exemption set out in Article
32(4) allows signatory nations to make a reservation as to all of the provisions of
Article 7, *except for the provisions of Article 7 prohibiting the international*

*trafficking of psychotropic substances.* Article 32(4) specifically provides as follows:

> A State *on whose territory* there are plants growing wild which contain psychotropic substances from among those in Schedule I and which are traditionally used by certain small, clearly determined groups in magical or religious rites, may, at the time of signature, ratification or accession, make reservations concerning these plants, in respect of the provisions of article 7, *except for the provisions relating to international trade.*

Convention, *supra*, at 1, art. 32(4), 32 U.S.T. 543 (emphasis added). In light of this very specific language, it is not possible to treat the exemption set out in Article 32 as diminishing the significant injury to the government flowing from an injunction mandating that the government allow the importation of *hoasca.*

### B. Balance of Harms and Public Interest

For those reasons set out above, UDV has not demonstrated a substantial likelihood of success on the merits of its RFRA claim. This is especially true in light of the heightened burden on UDV to demonstrate its entitlement to a preliminary injunction that upends the status quo. Independent of the question of likelihood of success on the merits, however, UDV has not demonstrated that its harm outweighs the harm flowing to the government as a result of the preliminary injunction or that the preliminary injunction is not adverse to the public interest.

RFRA provides that once a person proves that a law substantially burdens the exercise of religion, the government has the burden of going forward and of

-37-

persuasion in proving that the law furthers a compelling governmental interest and that the law as applied is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. §§ 2000bb-1(a), 2000bb-1(b)(1)-(2), 2000bb-2(3). Though this is a demanding test, *see City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), it seems particularly appropriate to insist that a movant meet all elements of the preliminary injunction test because RFRA goes beyond the protections offered by the First Amendment. *See Kikumura v. Hurley*, 242 F.3d 950, 955, 962 (10th Cir. 2001) (requiring consideration of all preliminary injunction elements with RFRA claim). In other words, RFRA is not the First Amendment and UDV has no valid claim that its First Amendment rights are being violated given that the CSA is a neutral law of general applicability. *See Smith*, 494 U.S. at 885; *United States v. Meyers*, 95 F.3d 1475, 1481 (10th Cir. 1996). Given evenly balanced evidence concerning the health risks of DMT usage and its potential diversion, UDV cannot satisfy its burden of showing that its injury outweighs any injury to the government and that an injunction would not be adverse to the public interest.

### 1. Controlled Substances Act

First and foremost, as set out above, Congress has specifically found that the importation and consumption of controlled substances is adverse to the public interest. 21 U.S.C. §§ 801(2), 801a(1). Congress has specifically found that the

drug at issue here, DMT, has high potential for abuse and is not safe to consume

even under the supervision of medical personnel. *Id.* § 812(b)(1), (c), sched.

I(c)(6).[13]

Against this backdrop, the district court found that the evidence was in

equipoise as to the risk of diversion of *hoasca* to non-religious purposes and the

danger of health complications flowing from *hoasca* consumption by UDV

members. As noted above, both Judge Seymour and Judge McConnell

erroneously rely on this finding to conclude that the United States has not carried

its burden of demonstrating that the restrictions in the CSA against the

importation and consumption of *hoasca* further the United States' compelling

---

[13]Judge Seymour appears to assert that it is improper to rely on these congressional findings in light of the passage of RFRA. Opinion of Seymour, J., at 27 n.8 ("Judge Murphy relies heavily on Congress' specific findings that the importation and consumption of controlled substances are adverse to the public interest . . . while totally ignoring the immediate and strong reaction Congress had to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990)."). Judge Seymour's assertion is flawed. As the congressional findings accompanying RFRA make clear, what Congress found offensive about *Smith* was its abandonment of the compelling interest test with regard to laws neutral to religion. 42 U.S.C. § 2000bb(a). None of the findings in § 2000bb(a), or any other portion of RFRA, indicate that the interests protected by the CSA are not compelling. In fact, there is no mention at all of the CSA in § 2000bb(a). Judge Seymour has simply failed to explain how the findings set out in § 2000bb(a) minimize the magnitude of the interests identified by Congress in enacting the CSA. Because RFRA requires that government conduct which burdens religion be in furtherance of a compelling governmental interest, *id.* § 2000bb-1(b)(1), and because the congressional findings accompanying the CSA bear on the question whether the governmental interests at issue in this case are compelling, the congressional findings accompanying the CSA are highly relevant.

interests and that, concomitantly, UDV is substantially likely to prevail on the merits of its RFRA claim. Opinion of Seymour, J., at 21; Opinion of McConnell, J., at 17-18. The United States, however, has no such burden at the third and fourth steps of the preliminary injunction analysis. At these stages, it is UDV that must demonstrate the requested preliminary injunction is not adverse to the public interest and its harm outweighs any harm to the government. Furthermore, because the preliminary injunction UDV is requesting would upset the status quo, it must show that the exigencies of the case entitle it to this extraordinary interim relief and that the balance of harms favors the issuance of an otherwise disfavored interim remedy. In light of the congressional findings noted above and the equipoised nature of the parties' evidentiary submissions, UDV has not met its burden.[14]

---

[14]Judge Seymour seems to take comfort in the fact that the preliminary injunction only temporarily precludes the government from enforcing the CSA. *See* Opinion of Seymour, J., at 24. As noted above, however, Congress has specifically found that the consumption of DMT is unsafe even when consumed under medical supervision and that the drug has a high potential for abuse. *See* 21 U.S.C. § 812(b)(1). UDV could not muster sufficient evidence to demonstrate that consumption of DMT is safe or that there is no risk of diversion. Although it is true that the preliminary injunction could be quickly lifted should the United States prevail on the merits, such a course would not remediate any harm that might occur to the members of UDV or the general citizenry from diverted *hoasca* while the preliminary injunction was in effect. Judge Seymour's approach thus seems to wholly discount those risks that inhere in the preliminary injunction.

The United States suffers irreparable injury when it is enjoined from enforcing its criminal laws. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (Rehnquist, Circuit Justice 1977). This injury to the United States, which when coupled with UDV's failure of proof on the questions of diversion and danger to UDV members prevents UDV from meeting its burden under the third and fourth preliminary injunction factors, is exacerbated by the burdensome and constant official supervision and oversight of UDV's handling and use of *hoasca* affirmatively required by the injunction in this case. The district court's preliminary injunction is eleven pages long and contains thirty-six paragraphs; it modifies or enjoins enforcement of a staggering number of regulations implementing the CSA, with the result that the United States must actually set about to aid UDV in the importation of an unlimited supply of *hoasca*.[15] UDV has not carried its burden of demonstrating that its injury, although admittedly irreparable, sufficiently outweighs the harm to the government

_____

[15]*See, e.g.,* Preliminary Injunction para. 13 (giving UDV right to refuse to allow inspections of any items, pending a determination by the district court, if UDV concludes such an inspection would violate its right to freedom of association); *id.* para. 15 (directing United States and UDV to "arrive at a mutually acceptable means of disposal of any hoasca that must be disposed of"); *id.* para. 24 (setting out time frames within which United States must conduct inspections); *id.* para. 25 (requiring United States to expedite UDV applications to import and distribute *hoasca*); *id.* para. 29 (seriously limiting circumstances under which United States can revoke UDV's registration to import and distribute *hoasca*); *id.* para. 35 (requiring United States to designate person or small group of persons to act as liaison with UDV).

so as to warrant interim relief that alters the status quo pending a determination of the merits.[16]

---

[16]In concluding that the injunction in this case is prohibitory rather than mandatory, Judge Seymour makes much of the fact that many of the provisions in the preliminary injunction were added at the government's insistence. Opinion of Seymour, J., at 16-17. This, however, over-simplifies the procedural history and thereby belies the actual process by which the burdensome provisions found their way into the district court's preliminary injunction. After concluding that UDV was entitled to an injunction on its RFRA claim, the district court directed the parties to submit proposed forms of a preliminary injunction. When the parties were unable to agree as to the form of the preliminary injunction, UDV submitted a memorandum on the question. In that memorandum, UDV proposed a limited regulatory scheme different and independent from the regulations set out in the Code of Federal Regulations governing Schedule I substances. In response, the United States asserted that UDV remained bound by applicable regulations relating to the lawful importation and distribution of Schedule I substances *because UDV had never lodged a proper legal challenge to those regulations*. The government thus asserted that although UDV had challenged restrictions on its *use* of *hoasca*, it had not challenged generally applicable regulations regarding the lawful *importation*, *distribution*, and *possession* of Schedule I substances. Accordingly, the form of the preliminary injunction submitted by the government required UDV to comply with all applicable statutes and regulations *to which UDV had failed to lodge a legal challenge*. Notably, no provision in the government's proposed preliminary injunction required the government to engage in a cooperative enterprise with UDV by setting strict time limits within which the government was obliged to act, required the government to negotiate with UDV over disposal of *hoasca*, or required the government to designate a liaison to deal directly with UDV. Accordingly, it is simply wrong to assert that it was the government who requested the provisions in the preliminary injunction that it now challenges as burdensome. Furthermore, it is wrong to assert that the preliminary injunction entered by the district court is wholly prohibitory. The provisions identified above are clearly mandatory in that they require the government to take action outside of the normally applicable regulatory framework for the lawful importation, distribution, and possession of a substance containing DMT. As a consequence, the preliminary injunction constructs a customized regulatory scheme for UDV that differs from the regulatory scheme

(continued...)

-42-

Unfortunately, Judge Seymour's separate opinion could be read as shifting the burden to the government to prove that its harm flowing from an injunction prohibiting enforcement of the CSA outweighs the harm to UDV and that the preliminary injunction is not adverse to the public interest. Opinion of Seymour, J., at 24 ("As the UDV established to the district court's satisfaction, neither of the potential harms asserted by the government are more likely than not to occur. Thus, the balance is between actual irreparable harm to plaintiff and potential harm to the government which does not even rise to the level of a preponderance of the evidence."). The problem with such an approach is that even when a requested preliminary injunction does not alter the status quo, the movant has the burden of demonstrating, clearly and unequivocally, that it is entitled to interim relief that is always extraordinary. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260-61 (10th Cir. 2004). Because this particular preliminary injunction does alter the status quo, UDV must make an even more

---

[16](...continued)
otherwise applicable to the lawful importation, distribution, and possession of Schedule I substances. Accordingly, Judge Seymour is wrong in discounting the magnitude of the harm to the government from the district court's eleven-page, thirty-six-paragraph preliminary injunction. Although the preliminary injunction at issue here is subject to a heightened standard because it alters the status quo, thus obviating the need to definitively determine whether the injunction as a whole is mandatory or prohibitory, Judge Seymour certainly errs in discounting the burdens imposed on the government as a result of the district court's preliminary injunction.

rigorous showing, as set out above, of its entitlement to interim relief. *See supra* at 9-10. With this in mind, it must be noted that it is UDV that failed to show by a preponderance of the evidence there was no risk of diversion and no risk to the health of UDV members. The government has no such burden of proof at the third and fourth stages of the preliminary injunction analysis. To conclude that UDV satisfied its burden defies the record and the district court's findings that the evidence is in equipoise.

Judge Seymour's discussion of the balancing of the harms flowing from enjoining enforcement of the CSA is similarly unconvincing. UDV would certainly suffer an irreparable harm, assuming of course that it is likely to succeed on the merits of its RFRA claim. On the other hand, the magnitude of the risk of harm to the government is unquestionably substantial. Although the harm identified by the government is a risk of diversion and a risk of adverse health consequences to members of UDV or to a member of the public who obtains diverted *hoasca*, if the risk comes to fruition the consequences could be deadly. As explained above, UDV failed to demonstrate that there is no risk of diversion or of adverse health consequences to UDV members. As the district court's findings demonstrate, it is just as likely as not that *hoasca* will be diverted and that members of UDV and the public will suffer adverse health consequences. *Cf.* 21 U.S.C. § 812(b)(1), (c), sched. I(c)(6) (finding that DMT is unsafe to consume

-44-

even under medical supervision).  Both Judge Seymour and Judge McConnell seriously undervalue the magnitude of the risks identified by the government in concluding that UDV's actual harm outweighs the risks of harm identified by the government.

At its base, the concurring opinion of Judge McConnell would convert RFRA into a 900-pound preliminary injunction gorilla.  According to Judge McConnell, the third and fourth preliminary injunction factors have no real play when RFRA is involved.  Opinion of McConnell, J., at 36-37 ("When the government fails to demonstrate its compelling interest in burdening a constitutional right, courts routinely find that, in the absence of a compelling justification for interference, the balance of harms and public interest also favor protecting the moving party's burdened rights.").  Thus, according to Judge McConnell, once a party demonstrates a substantial likelihood of success on the merits in a RFRA case, the inquiry is complete.  *Id.*  Other than simply noting that Congress passed RFRA only to restore the compelling interest test from *Sherbert v. Verner*, 374 U.S. 398 (1963), Judge McConnell offers no real support for his implicit proposition that RFRA renders irrelevant each of the remaining preliminary injunction factors.[17]  Judge McConnell thus rewrites RFRA so that it

_____

[17]Judge McConnell does cite to a number of cases involving the deprivation of a constitutional right.  Opinion of McConnell, J., at 37-38.  As noted above,

(continued...)

-45-

would now legislatively overrule decades of preliminary injunction jurisprudence, something RFRA does not do expressly.

Equally unconvincing is Judge McConnell's assertion that equitable considerations that might not carry the day for the government at the likelihood-of-success-on-the-merits stage are rendered irrelevant by RFRA at the balancing-of-harms and public-interest stages. Opinion of McConnell, J., at 36 ("[T]he dissent attempts to make an end run around RFRA's reinstatement of strict scrutiny by repackaging all of the arguments that would be relevant to the merits (where the presumption of invalidity would clearly apply) as arguments about the equities (where it is disregarded)."). The preliminary injunction is, after all, an equitable remedy. Even where a movant demonstrates that it is substantially likely to prevail on the merits, a showing that UDV has failed to make, there may very well be equitable considerations counseling against the granting of extraordinary relief prior to a final determination on the merits. This is just such a case. Without regard to whether UDV is substantially likely to prevail on the merits, the evidence adduced before the district court raises such serious questions about the adverse

---

[17](...continued)
both Judges McConnell and Seymour seem to forget that the right at issue in this case is based on a congressional enactment, not the Constitution. Furthermore, as noted at length above, RFRA must be read in light of its historical context. RFRA merely restored the law to its pre-*Smith* state, a state of law under which courts routinely rejected religious exemptions from generally applicable drug laws.

health effects of *hoasca*, both as to UDV members and the public at large, and about the consequences of forced non-compliance with the Convention that interim equitable relief is not appropriate in this case.

Nor does the Supreme Court's recent decision in *Ashcroft v. ACLU*, 124 S. Ct. 2783 (2004), support Judge McConnell's assertion that equitable considerations are irrelevant under RFRA, once a movant has demonstrated a substantial likelihood of success on the merits. *See* Opinion of McConnell, J., at 38-40. Judge McConnell cites the following passage from *Ashcroft* in support of his proposition:

> As mentioned above, there is a serious gap in the evidence as to the effectiveness of filtering software. . . . For us to assume, without proof, that filters are less effective than COPA would usurp the District Court's factfinding role. By allowing the preliminary injunction to stand and remanding for trial, we require the Government to shoulder its full constitutional burden of proof respecting the less restrictive alternative argument, rather than excuse it from doing so.

Opinion of McConnell, J., at 39-40 (quoting *Ashcroft*, 124 S. Ct. at 2794). Contrary to Judge McConnell's assertion, this passage simply does not relate in any fashion to the equitable process of balancing the competing harms or examining how a requested injunction would affect the public interest that occurs at the third and fourth stages of the preliminary injunction inquiry. Instead, it relates only to the question whether the movants in that case were likely to prevail on the merits. *See Ashcroft*, 124 S. Ct. at 2791-92 ("As the Government bears the

-47-

burden of proof on the ultimate question of COPA's constitutionality, respondents

must be deemed likely to prevail unless the Government has shown that

respondents' proposed less restrictive alternatives are less effective than COPA.").

To the extent that there is any meaningful discussion in *Ashcroft* of the

particular issue before this court,[18] *Ashcroft* supports the approach set out in this

opinion.  In concluding that the preliminary injunction should stand under the

particular circumstances of that case, the *Ashcroft* Court noted as follows:

> [T]he potential harms from reversing the injunction outweigh those of
> leaving it in place by mistake.  Where a prosecution is a likely
> possibility, yet only an affirmative defense is available, speakers may
> self-censor rather than risk the perils of trial.  There is a potential for
> extraordinary harm and a serious chill upon protected speech.  The
> harm done from letting the injunction stand pending a trial on the
> merits, in contrast, will not be extensive.  No prosecutions have yet
> been undertaken under the law, so none will be disrupted if the
> injunction stands.  Further, if the injunction is upheld, the
> Government in the interim can enforce obscenity laws already on the
> books.

*Ashcroft*, 124 S. Ct. at 2794 (citation omitted).  This passage indicates that

"practical" considerations, including considerations that might not carry the day at

the likelihood-of-success-on-the-merits stage, are nevertheless relevant when a

court is undertaking a weighing of the equities.  *Id.*  In this case, those practical

considerations most assuredly counsel against granting interim relief to UDV.  The

---

[18]That is, whether equitable considerations might occasionally preclude the grant of a preliminary injunction even though a movant has demonstrated a likelihood of success on the merits.

record clearly indicates, and the district court found, that it is just as likely as not that UDV members will suffer adverse health consequences as a result of the consumption of *hoasca* and that *hoasca* will be diverted to the general public. Furthermore, with the preliminary injunction in place, the government is left with no alternative avenues to further the important public safety policies underlying the CSA. This is in stark contrast to the situation in *Ashcroft*, wherein the government could "in the interim [continue to] enforce obscenity laws already on the books." *Id.* For those reasons set out above, this is clearly one of those cases where equitable considerations weigh heavily against the entry of a preliminary injunction, even assuming UDV has demonstrated a substantial likelihood of prevailing on the merits.

    *2. United Nations Convention on Psychotropic Substances*

    As noted above, a preliminary injunction requiring the United States to violate the Convention could seriously impede the government's ability to gain the cooperation of other nations in controlling the international flow of illegal drugs. 21 U.S.C. § 801a(1) ("Abuse of psychotropic substances has become a phenomenon common to many countries . . . and is not confined to national borders. It is, therefore, essential that the United States cooperate with other nations in establishing effective controls over international traffic in such substances."). Furthermore, the only evidence in the record on this question, the

Dalton declaration, indicates the need to avoid a violation that would undermine the United States' role in curtailing illicit drug trafficking.

Without regard to whether the declaration and congressional findings are sufficient to carry the government's burden of demonstrating that absolute compliance with the Convention is the least restrictive means of advancing the government's compelling interest, the declaration, taken together with the congressional findings, certainly bears on the question of harm to the United States and the adversity of the preliminary injunction to the public interest. These matters were not even addressed by the district court. In light of the declaration, the congressional findings, and the extant status quo, UDV has simply not carried its burden of demonstrating that its interest in the use of sacramental *hoasca* pending the resolution of the merits of its complaint outweighs the harm resulting to the United States from a court order mandating that it violate the Convention. Nor has UDV shown that such an injunction is not adverse to the public interest.

## III.

The court correctly reaffirms the central holding in *SCFC ILC* that when a movant is seeking one of the three historically disfavored types of preliminary injunctions, the movant must satisfy a higher burden. I, therefore, join parts I, II, and III.A of the *per curiam* opinion.

For those reasons set out above, UDV has failed to make the strong showing necessary to demonstrate its entitlement to a judicially ordered alteration of the status quo pending the resolution of the merits of this case. First, UDV has not demonstrated a substantial likelihood of success on the merits. The government's assertion that the ban on the consumption of DMT/*hoasca* is necessary to protect the health of UDV members and to prevent diversion of a Schedule I psychotropic drug to the general population is fully supported by the congressional findings set out in the CSA. 21 U.S.C. §§ 801(2), 801a(1), 812(b)(1), 812(c), sched. I(c)(6). These same congressional findings also demonstrate the need for uniformity in administration of the drug laws. *See Smith*, 494 U.S. at 905-06 (O'Connor, J., concurring); *Israel*, 317 F.3d at 771. At the same time, it is clear that Congress enacted RFRA to restore the pre-*Smith* compelling interest test. 42 U.S.C. § 2000bb(a). Prior to *Smith*, courts routinely rejected religious exemptions from laws regulating controlled substances. *See supra* at 19-20 (setting out pre- and post-RFRA cases rejecting religious exemptions from neutrally applicable drug laws). There is simply nothing in the legislative history of RFRA to indicate that it was intended to mandate a drug-by-drug, religion-by-religion judicial reexamination of the nation's drug laws. UDV has failed to demonstrate that it is substantially likely to prevail on its claim that RFRA exempts it from the prohibition against the consumption of DMT set out in the CSA. UDV has

likewise failed to demonstrate that it is substantially likely to prevail on its RFRA claim, when measured against the government's interest in complying with the Convention. Congress specifically found that international cooperation is necessary to stem the international flow of psychotropic drugs. 21 U.S.C. § 801a(1). The Dalton declaration demonstrates that an injunction forcing the United States into non-compliance with the Convention could undermine the United States' efforts to obtain international cooperation to control the cross-border traffic in illegal drugs. Because UDV has failed to demonstrate a substantial likelihood of success on the merits, it is not entitled to a preliminary injunction.

Even setting aside the question of whether UDV is substantially likely to prevail on the merits, UDV has independently failed to carry its heavy burden of establishing that the balance of harms and the public interest favors the issuance of a preliminary injunction. Setting aside the Convention for the moment and considering these factors only in relation to the CSA, UDV failed to establish entitlement to extraordinary interim relief altering the status quo. The district court found, as part of its analysis of likelihood of success on the merits, that the evidence regarding risk of diversion and harm to members of UDV was virtually balanced and in equipoise. In other words, the district court found that it is just as likely as not that *hoasca* will be diverted to the general public and that members of

UDV will suffer harm from the consumption of *hoasca*. These findings make it clear that UDV failed to muster sufficient evidence to demonstrate that the balance of harms weighs clearly and unequivocally in its favor and that the public interest clearly and unequivocally favors the entry of a preliminary injunction. The harm to the government and public interest is not, however, singularly related to the CSA. Harm to the government and the public interest resulting from the court-ordered violation of the Convention remain unaddressed by UDV or the district court. Furthermore, both Judge Seymour's and Judge McConnell's attempts to minimize the significant harm flowing to the government as a result of its forced non-compliance with the Convention are flawed. With the evidence of the balance of harms and public interest in such a state, UDV has utterly failed to meet its burden under the third and fourth preliminary injunction factors.

I would reverse the district court's entry of a preliminary injunction. Because a majority of the court concludes otherwise, I respectfully dissent from parts III.B and IV of the *per curiam* opinion.

-53-

No. 02-2323; *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*

**SEYMOUR**, Circuit Judge, concurring in part and dissenting in part, joined in full by **TACHA**, Chief Judge, **PORFILIO, HENRY, BRISCOE**, and **LUCERO**, Circuit Judges, and in Part II by **McCONNELL** and **TYMKOVICH**, Circuit Judges.

Like a majority of my colleagues, I am persuaded that the district court did not abuse its discretion in granting the preliminary injunction in this case. I respectfully dissent, however, from the majority's conclusion that the movant for a preliminary injunction must satisfy a heightened burden when the proposed injunction will alter the status quo but the injunction is not also mandatory.

**I**

It is well established that "[a] preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). Its commonly asserted purpose is to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *See also* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2947 at 123 (2d ed. 1995) (purpose of preliminary injunction is to prevent non-movant from taking unilateral action which would prevent court from providing relief to the movant on the merits).

In making the equitable determination to grant or deny a preliminary injunction, courts tend to balance a variety of factors. We have stated generally that a court will grant preliminary relief only if the plaintiff shows "(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; (4) the injunction is not adverse to the public interest." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). These factors provide guideposts for a court in its attempt to minimize any harm that would result from the grant or denial of preliminary relief. The manner by which a court considers the factors, the relative weight given to each, and the standards by which a movant is required to prove them, are driven by the special and unique circumstances of any given case.

> As noted by Professor Dobbs:
>
> [T]he gist of the standards is probably easy to understand in common sense terms even if the expression is imperfect: the judge should grant or deny preliminary relief with the possibility in mind that *an error might cause irreparable loss to either party. Consequently the judge should attempt to estimate the magnitude of that loss on each side and also the risk of error*.

DAN B. DOBBS, LAW OF REMEDIES § 2.11(2) at 189 (2d ed. 1993) (emphasis added). *American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589 (7th Cir. 1986), epitomizes this approach, noting that when a district court is

-2-

asked to decide whether to grant or deny a preliminary injunction [it] must choose the course of action that will minimize the costs of being mistaken. . . . If the judge grants the preliminary injunction to a plaintiff who it later turns out is not entitled to any judicial relief – whose legal rights have not been violated – the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the injunction causes to the defendant while it is in effect.  If the judge denies the preliminary injunction to a plaintiff who it later turns out is entitled to judicial relief, the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the denial of the preliminary injunction does to the plaintiff.

*Id.* at 593.  Due to this inherently fluid, multi-faceted, and equitable process, we review a district court's decision to grant or deny injunctive relief for abuse of discretion.  *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).  In so doing, we should keep in mind that

the district judge had to act in haste, that he had to balance factors which, though they can be related in a neat formula, usually cannot be quantified, and that in dealing with the parties and their witnesses and counsel in the hectic atmosphere of a preliminary-injunction proceeding the judge may have developed a feel for the facts and equities that remote appellate judges cannot obtain from a transcript.

*American Hosp. Supply Corp.*, 780 F.2d at 594-95.  Thus "it is not enough that we think we would have acted differently in the district judge's shoes; we must have a strong conviction that he exceeded the permissible bounds of judgment." *Id.* at 595.

## A.

In *SCFC ILC*, we held that movants requesting certain preliminary injunctions must meet a heightened standard instead of satisfying the ordinary preliminary injunction test. We detailed that a party who seeks an injunction which either changes the status quo, is mandatory rather than prohibitory, or provides the movant with substantially all the relief he would recover after a full trial on the merits, was required to "show that on balance, the four [preliminary injunction] factors weigh heavily and compellingly in his favor." *SCFC ILC, Inc.*, 936 F.2d at 1099 (emphasis added). We appear to be the only court which has adopted the specific approach of carving out three distinct categories of disfavored injunctions. Other courts have limited to two categories those preliminary injunctions deserving special scrutiny: injunctions which are mandatory or which provide the moving party with all the relief it seeks from a full trial on the merits. *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003); *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34-35 (2d Cir. 1995); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980); *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1980).[1] In order to bring our jurisprudence in closer accord with these

---

[1]I disagree with Judge McConnell's characterization of the cases I have cited for the proposition that the other circuits limit their categories of disfavored injunctions to those which are mandatory and those which provide the movant

(continued...)

-4-

other circuits, and because I am convinced it will cause less confusion to the parties and the district court, I would limit our heightened standard to those two categories of preliminary injunctions.

---

[1](...continued) with all the relief afforded on the merits. McConnell, J., op. at 6 n.4. As noted above, no other circuit follows our approach of identifying three categories of disfavored injunctions. Courts which speak of applying some form of heightened standard to preliminary injunctions that alter the status quo specifically define those types of injunctions as mandatory. *See Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 33-34 (speaking broadly about applying a heightened standard to preliminary injunctions that alter the status quo, *id.* at 33, but then immediately defining with more specificity the two categories of disfavored injunctions as those which are mandatory, and those which provide all the relief sought on the merits, *id.* at 34); *see also In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) ("Mandatory preliminary injunctions [generally] do not preserve the status quo . . . .") (alteration in original); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity."); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) ("Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief."); *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1980) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored.") (citations omitted). While Judge McConnell may disagree with the manner by which I think courts should consider the question of status quo, it cannot be said I am advocating an approach that is discordant from that employed by other courts. To the contrary, by separating out and adding injunctions that alter the status quo as a third category of disfavored injunctions, it is the majority that is out of step. *See generally* DOUGLASS LAYCOCK, MODERN AMERICAN REMEDIES 450 (3d ed. 2002); Thomas R. Lee, *Preliminary Injunctions and the Status Quo*, 58 WASH. & LEE L. REV. 109 (2001).

-5-

In doing so, I do not denigrate the general notion that the purpose of a preliminary injunction is to preserve the status quo between the parties pending a full trial on the merits. But this general maxim should not be taken merely at face value or become a goal in and of itself. Rather, the very purpose of preserving the status quo by the grant of a preliminary injunction is to prevent irreparable harm pending a trial on the merits. *See, e.g., In re Microsoft*, 333 F.3d at 525 ("The traditional office of a preliminary injunction is to protect the status quo and prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."); *Matzke v. Block*, 542 F. Supp. 1107, 1113 (D. Kan. 1982) ("The purpose of a preliminary injunction is two-fold: it protects the plaintiff from irreparable injury and it preserves the court's ability to decide the case on the merits."); 11A WRIGHT & MILLER, § 2947 at 121 ("a preliminary injunction is an injunction that is issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits").

Given the essential role prevention of irreparable harm plays in the grant of preliminary injunctive relief,[2] district courts should consider the question of

---

[2]In the course of deciding whether to grant preliminary injunctive relief, "courts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be

(continued...)

altered status quo in light of how it impacts the balance of harms between the parties and the public interest, as well as considering what attendant institutional costs may accompany the grant of such relief. As the Fifth Circuit has said, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (citations omitted). Other courts echo this refrain, noting that where preserving the status quo will perpetuate harm against the moving party, an order altering the status quo may be appropriate. *See, e.g., Friends For All Children v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984); *Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 995 (1st Cir. 1982), *reversed on other grounds,* 476 U.S. 526 (1984); *see also* 11A WRIGHT & MILLER § 2948 at 133-35. For these reasons, "[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Canal Auth.*, 489 F.2d at 576. Thus a court's examination of the status quo should occur during the process of balancing the various interests and harms among the parties and the public.

---

²(...continued)
considered.'" *Dominion Video Satellite v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1260-61 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990), and listing other cases). Without a showing of irreparable harm, there exists no justification for granting the extraordinary remedy of injunctive relief prior to trial because any other harm can be compensated for by damages at the end of the trial.

**B.**

Our circuit currently employs three different standards when granting preliminary injunctions. As a base line, we have articulated that a party's right to injunctive relief must be "clear and unequivocal." *See SCFC ILC Inc.*, 936 F.2d at 1098 (citing *Penn v. San Juan Hosp.*, 582 F.2d 1181, 1185 (10th Cir. 1975)). At one end of the spectrum, we have applied *SCFC ILC*'s "heavily and compellingly" language to injunctions requiring heightened scrutiny. *Id.* at 1098-99. At the other end, we have adopted a modified approach for the "likelihood of success on the merits" aspect of the four part preliminary injunction test for certain circumstances. Under this alternative approach, if the moving party establishes that the last three factors of the test are in its favor, the party may ordinarily satisfy the first factor by "showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Federal Lands Legal Consortium v. United States*, 195 F.3d 1190, 1195 (10th Cir. 1999). Within this paradigm, and in accordance with the principle that a preliminary injunction should preserve the parties' positions to prevent irreparable harm and allow the court to make a meaningful decision on the merits, the court's focus properly remains on the balance of relative harms between the parties.

In general, "[e]mphasis on the balance of [irreparable harm to plaintiffs and defendants] results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa." *In re Microsoft*, 333 F.3d at 526. Thus, the more likely a movant is to succeed on the merits, "the less the balance of irreparable harms need favor the [movant's] position." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). And, alternatively, "if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important." *Canal Auth.*, 489 F.2d at 576-77. The rationality of this approach is evident: where there is a strong indication that the plaintiff is correct on the merits, the less it is likely that the defendant will be harmed by the issuance of a preliminary injunction; where there is little likelihood a plaintiff will be irreparably harmed, preliminary relief is unwarranted unless it is virtually certain plaintiff will win on the merits.

Given the special considerations and potential administrative costs at stake when a court issues a mandatory preliminary injunction, we should more closely scrutinize whether the irreparable harm to the movant substantially outweighs any harm to the non-movant or to the public interest. The movant should clearly show the exigencies of the situation justify the rather unusual injunction. *See Tom Doherty Assocs.*, 60 F.3d at 34 ("[A] mandatory injunction should issue only upon

-9-

a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial or preliminary relief." (internal quotations omitted)); *Anderson*, 612 F.2d at 1114 (mandatory preliminary relief justified only where "facts and law clearly favor the moving party" or where "extreme or very serious damage will result"); *In re Microsoft*, 333 F.3d at 525 (showing for preliminary mandatory relief "must be indisputably clear"); *Wetzel*, 635 F.2d at 286 (mandatory preliminary injunctions "should be granted only in those circumstances when the exigencies of the situation demand such relief").

Although a mandatory injunction should be granted only where the moving party makes a strong showing that all the preliminary injunction factors weigh in its favor, we should abandon use of the "heavily and compellingly" language employed in *SCFC ILC*, *see* 936 F.2d at 1098-99, which is not used by any other circuit. In addition, because a party seeking the grant of a mandatory preliminary injunction must make this stronger showing, the party should not be able to rely on our circuit's modified likelihood of success on the merits standard, even where the balance of harms favors the movant. Rather, the movant for a mandatory preliminary injunction must also establish a substantial likelihood of success on the merits. *See Tom Doherty Assocs.*, 60 F.3d at 33-34 (party seeking mandatory injunction cannot rely solely on circuit's relaxed likelihood of success on merits standard); *SCFC ILC*, 936 F.2d at 1101 n.11 (applicant for disfavored injunction

unlikely to satisfy higher standard without proving likelihood of success on merits).

The same is true for injunctions that provide the movant with all the relief that could be obtained at trial. *See SCFC ILC*, 936 F.2d at 1099 (applying heightened standard to preliminary injunctions that provide the movant with all relief that could be obtained at trial). In this context, however, the

> term "all the relief to which a plaintiff may be entitled" *must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone*. A heightened standard can thus be justified when the issuance of an injunction will render a trial on the merits largely or partly meaningless, either because of temporal concerns, say, a case involving the live televising of an event scheduled for the day on which preliminary relief is granted, or because of the nature of the subject of the litigation, say, a case involving the disclosure of confidential information.

*Tom Doherty Assocs.*, 60 F.3d at 35 (emphasis added). *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1249 (10th Cir. 2001) (citing *Tom Doherty Assocs.* for this proposition). For example, while the preliminary injunction here may give the UDV all the relief it would obtain after a full trial on the merits, the district court's order can nonetheless be "undone" should the UDV ultimately be unsuccessful at trial. This situation is clearly different from the examples listed in *Tom Doherty Assocs.* Moreover, the grant of a preliminary injunction in this case does not "make it difficult or impossible to render a meaningful remedy," *id.*, to the government. If the UDV does not prevail at trial,

-11-

the government will be able to enforce the CSA against the church and its members and comply with the Convention.

In sum, we should limit our categories of injunctions requiring greater scrutiny to those which are mandatory or which afford the movant all the relief it seeks after a full trial on the merits, and abandon the use of *SCFC ILC*'s "heavily and compellingly" language. In addition, a party seeking an injunction requiring greater scrutiny may not rely on our relaxed "success on the merits" standard but must make a strong showing that it has a likelihood of success on the merits and that the balance of harms weighs in its favor. However, I depart from my colleagues who hold that a heightened standard should always be applied when the injunction will change the status quo. Rather, district courts should assess alteration of the status quo in light of its impact on the balance of harms among the parties and the public interest.

## II

Turning to the question of whether the district court properly granted the preliminary injunction to the UDV, our court reviews the district court's grant of injunctive relief for abuse of discretion and "examine[s] whether the district court committed error of law or relied on clearly erroneous fact findings." *Walmer v. U.S. Dep't of Defense*, 52 F.3d 851, 854 (10th Cir. 1995). We also give due

deference "to the district court's evaluation of the substance and credibility of testimony, affidavits, and other evidence. We will not challenge that evaluation unless it finds no support in the record, deviates from the appropriate legal standard, or follows from a plainly implausible, irrational or erroneous reading of the record." *United States v. Robinson*, 39 F.3d 1115, 1116 (10th Cir. 1994).

The district court focused the majority of its analysis on whether the UDV could satisfy the likelihood of success on the merits prong of the preliminary injunction test. *See Kikumura*, 242 F.3d at 955 (listing elements of preliminary injunction test). Because the government did not dispute for the purpose of the injunctive proceeding that its enforcement of the CSA and the United Nations Convention on Psychotropic Substances (Convention or treaty) imposed a substantial burden on the UDV's sincere exercise of religion, the UDV established a *prima facie* case of a RFRA violation. *See id.* at 960. To undercut this showing of likelihood of success, the government had the burden of establishing that "the challenged regulation furthers a compelling interest in the least restrictive manner." *See* 42 U.S.C. § 2000bb-1(b); *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996).

The government proffered three compelling interests – risks to the health of the UDV members by the use of *hoasca*, risk of diversion of *hoasca* for non-religious purposes, and compliance with the Convention. "Believing the

Government's strongest arguments for prohibiting Uniao do Vegetal's *hoasca* use to be health and diversion risks, the district court did not ask the parties to present evidence on the Convention at the hearing." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1183 (10th Cir. 2003). After examining the parties' evidence on the first two issues, the court found the evidence to be in equipoise for each. The court also decided the treaty does not cover *hoasca*. The court therefore concluded the government had "failed to carry its heavy burden of showing a compelling interest in protecting the health of the UDV members using hoasca or in preventing the diversion of hoasca to illicit use." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1269 (D.N.M. 2002). Hence, the court ruled the UDV had demonstrated a substantial likelihood of success on the merits.

The district court then turned to the remaining preliminary injunction factors and determined the UDV satisfied each. The court found the UDV established irreparable injury because its right to the free exercise of religion was being impaired. With respect to harm to the government and the balance of harms, the court held that

> in balancing the government's concerns against the injury suffered by the Plaintiffs when they are unable to consume hoasca in their religious ceremonies, the Court concludes that, in light of the closeness of the parties' evidence regarding the safety of hoasca use and its potential for diversion, the scale tips in the [church's] favor.

-14-

*Id.* at 1270. The court granted a preliminary injunction to the UDV pending a decision on the merits.

The government contends that the preliminary injunction granted by the district court is mandatory and changes the status quo, and that the district court erred in failing to require the UDV to make a stronger showing to succeed. I disagree. This case is unique in many respects because it involves a clash between two federal statutes, one based in the First Amendment to the Constitution and protecting an individual's free exercise of religion and the other serving the important governmental and public interests of protecting society against the importation and sale of illegal drugs. This case also serves as an example of how challenging it can be to determine whether an injunction is mandatory as opposed to prohibitory, or whether it alters the status quo.

I am not persuaded the injunction here is mandatory. Rather, it temporarily prohibits the government from treating the UDV's sacramental use of *hoasca* as unlawful under the CSA or the treaty. It also orders the government not to

> intercept or cause to be intercepted shipments of hoasca imported by
> the UDV for religious use, prosecute or threaten to prosecute the
> UDV, its members, or bona fide participants in UDV ceremonies for
> religious use of hoasca, or otherwise interfere with the religious use
> of hoasca by the UDV, its members, or bona fide participants in UDV
> ceremonies . . . .

Aplt. br., Add. B at 2.

-15-

The government contends the injunction is mandatory because it includes "36 separate provisions requiring specific affirmative action by the government to facilitate the UDV's use of hoasca." Aplt. Supp. En Banc br. at 20. In so arguing, the government fails to acknowledge that the additional provisions were added to the injunction by the district court in response to the government's insistence that the UDV be subject to some form of governmental oversight in its importation and use of *hoasca*. In large measure, the injunction's terms detail how the UDV must comply with the importation and distribution regulations for controlled substances. The injunction outlines how the regulations should be specifically construed regarding the UDV and lists provisions from which the church should be exempted. The injunction's terms also make clear that while the UDV is required to comply with the regulations, the government cannot rely on potential technical violations of the regulations by the church, or an overly broad reading of the regulations, to bar the UDV's importation of *hoasca*. While the order's terms do not exactly mirror those proposed to the court by the government, nor are they nearly as broad as the government might have hoped, they nonetheless are in the injunction because the government demanded the UDV be subject to some form of regulatory control in the course of importing and distributing *hoasca*. In this regard, the order's terms outline how the church must comply with the regulations while still protecting the church's importation and use of its sacrament.

Similarly, while some of the injunction's provisions mandate that the parties take specific actions, the order is nonetheless properly characterized as prohibitory. Read as a whole, the additional terms in the order *mandate that the UDV* comply with specific drug importation laws, while the provisions conversely *permit the government* to perform its regulatory functions with respect to the importation of controlled substances, up to but not including barring the UDV's use of *hoasca* for sacramental purposes. However, the overall effect of the injunction is to prohibit the government from enforcing the CSA and the treaty against the UDV.

There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing. In *Abdul Wali v. Coughlin*, the court recognized this difficulty but emphasized that

> [t]he distinction between mandatory and prohibitory injunctions, however, cannot be drawn simply by reference to whether or not the *status quo* is to be maintained or upset. As suggested by the terminology used to describe them, these equitable cousins have been differentiated by examining whether the non-moving party is being ordered to perform an act, or refrain from performing. In many instances, this distinction is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other.

*Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025-26 (2d Cir. 1985), *overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n.2 (1987). In

-17-

determining whether to define the contested injunction in the case before it as mandatory or prohibitory, the court in *Abdul Wali* looked to the gravamen of the plaintiff's complaint and found it did indeed seek to prohibit action on the part of the defendant, even though one could reasonably argue the injunction changed the status quo. *Id.* at 1026. So too in the case before us. The gravamen of the church's claim is to stop the government from enforcing the CSA against it and infringing on the use of its sacrament. Read in this light, the overall tone and intent of the order remains prohibitory because its purpose is to prohibit the government from interfering with the UDV's religious practices.

With respect to the question of status quo, it is generally described as "the last peaceable uncontested status existing between the parties before the dispute developed." 11A WRIGHT & MILLER § 2948, at 136 n.14 (listing cases). *See also Prairie Band of Potawatomi Indians*, 253 F.3d at 1249; *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001); *SCFC ILC, Inc.*, 936 F.2d at 1100 n.8. Here, however, we are faced with a conflict between two federal statutes, RFRA and the CSA, plus an international treaty, which collectively generate important competing status quos.

The status quo for the UDV was that it was practicing its religion through its importation and use of *hoasca* at religious ceremonies. I am not suggesting, as Judge Murphy argues, that the status quo is the UDV's *legal right* pursuant to

-18-

RFRA to the free exercise of its religion. Rather, as a matter of fact the church was actively engaged in its religious practices.[3] Status quo for the government immediately prior to this litigation was its enforcement of the drug laws against the UDV in accordance with the CSA and the Convention, which occurred after the government discovered the UDV was importing *hoasca* for religious purposes and exercised its prosecutorial discretion to stop that importation.

We are thus presented with two plausible status quos, each of them important. Moreover, since both parties contest the validity of the other's actions, it is difficult to describe either position as "the last peaceable, uncontested status existing between the parties." The injunction granted by the district court can certainly be read to have altered the status quo for the government and thereby caused it harm. Conversely, failure of the court to grant the injunction would have altered the status quo for the church, causing it harm. As discussed above, injunctive relief may be warranted where preserving the status quo perpetuates harm against the moving party. *See, e.g., Crowley*, 679 F.2d at 995 (preliminary

---

[3]I also disagree with Judge Murphy's contention that both the church and the government "recognized that the importation and consumption of *hoasca* violated the CSA," Murphy, J., opin. at 10, and therefore the status quo was solely the government's enforcement of the CSA and compliance with the treaty. The UDV may have acted in a somewhat clandestine manner in the course of importing the *hoasca* and using it in its religious ceremonies. However, its importation and use of the tea was premised on its firmly held belief that such religious activity was in fact protected from government interference by its right to the free exercise of its religion.

relief appropriate where perpetuation of status quo worked continuing harm to plaintiffs); *Canal Auth.*, 489 F.2d at 576 (status quo should not be perpetuated where it causes irreparable harm to one of the parties); *Sluiter v. Blue Cross & Blue Shield of Michigan*, 979 F. Supp. 1131, 1136 (E.D. Mich. 1997) (prevention of irreparable harm, rather than maintenance of status quo, should guide court in granting mandatory injunction, especially where preserving status quo severely threatens lives of movants). And the competing harms that might arise from a change in the status quo can be fully addressed under the balance of harms and public interest facets of the preliminary injunction test. *See, e.g., Millennium Restaurants Group, Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 667 (N.D. Tex. 2001) (balancing irreparable harm to sexually oriented business' First Amendment right of free expression against temporary harm to city by virtue of injunction preventing city from revoking license of business); *Mediplex of Massachusetts, Inc. v. Shalala*, 39 F. Supp. 2d 88, 100-01 (D. Mass. 1999) (preliminary injunction appropriate, in part, where harm to nursing facility residents arising from government's intention to close facility outweighed more general harm to government); *Canterbury Career School, Inc. v. Riley*, 833 F. Supp. 1097, 1105-06 (D.N.J. 1993) (injunction properly issued where plaintiff would suffer loss of federal funding and accreditation as balanced against more general harm to government).

Turning to the district court's review of the four preliminary injunction factors and giving due deference to its weighing of the evidence, I am convinced for all of the reasons described by the district court, *see supra* at 13-15, and set forth in the panel opinion, *O Centro*, 342 F.3d at 1179-87, that the court did not abuse its discretion in concluding the UDV has established the first preliminary injunction factor, a substantial likelihood of success on the merits of the case. *Id.* at 1187.[4] With respect to irreparable harm, the district court, acknowledging its jurisdiction was founded upon RFRA, correctly recognized that the violation of one's right to the free exercise of religion necessarily constitutes irreparable harm. *See, e.g., Kikumura*, 242 F.3d at 963 ("courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("although plaintiff's free exercise claim is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of

---

[4]I do not, however, include footnote 2 of the panel majority opinion in my reasoning here. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1173 n.2 (10th Cir. 2003). The language in that footnote could lead one to conclude that a plaintiff's initial showing of a *prima facie* RFRA violation would satisfy the likelihood of success on the merits prong of the preliminary injunction test regardless of the government's successful articulation of a restrictively applied compelling interest. Such a conclusion would be incorrect; only an *unrebutted* prima facie showing could establish the likelihood of success on the merits of a RFRA claim. *See id.* at 1179-87 (discussion regarding UDV's showing likelihood of success on the merits by virtue of government's failure to establish compelling interest applied in least restrictive manner).

his religious beliefs is a harm that cannot be adequately compensated monetarily"). The harm to the UDV from being denied the right to the use of a sacrament in its religious services is indisputably irreparable.

The district court then balanced the irreparable harm to the UDV against the harm the government would suffer from a preliminary injunction prohibiting its enforcement of the CSA against the church's religious use of a controlled substance, and from its compliance with the Convention. As Judge McConnell so aptly observes, one cannot evaluate the balance of harm and public interest factors separately and isolated from Congress' own balancing of these factors in RFRA. *See* McConnell, J., opin. at 33-36. In RFRA, Congress determined that the balance of equities and public interest should weigh in favor of the free exercise of religion and that this settled balance should only be disrupted when the government can prove, by specific evidence, that its interests are compelling and its burdening of religious freedom is as limited as possible. *See* 42 U.S.C. § 2000bb-1(a)-(b).

Certainly the interests of the government as well as the more general public are harmed if the government is enjoined from enforcing the CSA against the general importation and sale of street drugs, or from complying with the treaty in this regard. But this case is not about enjoining enforcement of the criminal laws against the use and importation of street drugs. Rather, it is about importing and

using small quantities of a controlled substance in the structured atmosphere of a bona fide religious ceremony. In short, this case is about RFRA and the free exercise of religion, a right protected by the First Amendment to our Constitution. In this context, what must be assessed is not the more general harm which would arise if the government were enjoined from prosecuting the importation and sale of street drugs, but rather the harm resulting from a temporary injunction against prohibiting the controlled use of *hoasca* by the UDV in its religious ceremonies while the district court decides the issues at a full trial on the merits.

As asserted by the government, the relevant harms in this context are the risk of diversion of *hoasca* to non-religious uses and the health risks to the UDV members who ingest the tea. As the panel opinion explained, however, the district court found that the parties' evidence regarding health risks to the UDV members from using *hoasca* as a sacrament in their religious services was "in equipoise," and the evidence regarding the risk of diversion to non-ceremonial users was "virtually balanced" or "may even . . . tip the scale slightly in favor of Plaintiffs' position." *See O Centro*, 342 F.3d at 1179-83 (citing district court and reviewing evidence).

I disagree with Judge Murphy's assertion that because plaintiffs have the burden of proof on the preliminary injunction factors they necessarily lose if the evidence is in equipoise on the question of harm to the government's asserted

interests.  *See* Murphy, J., opin. at 39-40.  As Judge Murphy recognizes, a plaintiff seeking a preliminary injunction has the burden of showing that the harm to it *outweighs* any harm to the party to be enjoined or to the public interest.  *See Kikumura*, 242 F.3d at 955.  Here the harm to the UDV from being denied the right to freely exercise its religion, which under anyone's measure carries significant weight and is *actually occurring*, must be measured against the *potential risks* of diversion of *hoasca* to non-religious uses and harm to the health of church members consuming the *hoasca*.  As the UDV established to the district court's satisfaction, neither of the potential harms asserted by the government are more likely than not to occur.  Thus, the balance is between actual irreparable harm to plaintiff and potential harm to the government which does not even rise to the level of a preponderance of the evidence.

Likewise, the harm resulting to the government from a violation of the Convention in this context is similar to the harm suffered as a result of the government's temporary inability to enforce the CSA against the church.  As with the CSA, the treaty must be read in light of RFRA and the religious use of the controlled substance here.[5]  While the general intent of the Convention was to

_____

[5]As the panel opinion makes clear:
[T]he Supreme Court has directed "that an Act of Congress . . . is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute, to the

(continued...)

-24-

prevent the illicit use and trafficking of psychotropic substances, it recognized that plants containing such substances were often used for legitimate religious purposes. It therefore permitted signatory nations to seek an exemption from the treaty for indigenous plants containing prohibited substances "traditionally used by certain small, clearly determined groups in magical or religious rites." *See* 1971 Convention on Psychotropic Substances, Art. 32(4), 32 U.S.T. 543. Indeed, the United States obtained such an exemption for peyote. *See O Centro*, 342 F.3d at 1175-76.

In light of the Convention's acknowledgment that the use of psychotropic substances in the course of religious rituals may warrant an exception from the treaty's terms, as well as the exemption granted to the United States for peyote, the government's argument that it will be significantly harmed by a preliminary injunction temporarily restraining it from enforcing the treaty against the UDV does not ring entirely true. This injunction temporarily bars the government in small part from abiding by a treaty which contemplates the religious use of plants

---

[5](...continued)
extent of conflict, renders the treaty null." *Id.* (*quoting Reid v. Covert*, 354 U.S. 1, 18) (1957) (plurality opinion)). *See also Whitney v. Robertson*, 124 U.S. 190, 194 (if treaty and statute conflict, "the one last in date will control the other").
*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1183-84 (10th Cir. 2003).

containing prohibited substances, in order that the UDV's exercise of its religious faith may be protected pending a full trial on the merits.

Moreover, given the competing status quos represented in this case – the church exercising its religion versus the government enforcing the drug laws and complying with the treaty – the district court's inclusion of the additional terms in the preliminary injunction, in which the government is permitted to perform most of its regulatory functions regarding the importation of this controlled substance, is a reasonable attempt to balance the harms suffered by either party until a full trial can be had on the merits. Viewed in this light, and given the conclusion that the UDV has a strong likelihood of succeeding on the merits of its claim under RFRA, the government's argument that it would be significantly harmed by a temporary injunction is considerably weakened.

With respect to harm to the public interest, there is an important public interest in both the enforcement of our criminal drug laws and in compliance with our treaty commitments. But there is an equally strong public interest in a citizen's free exercise of religion, a public interest clearly recognized by Congress when it enacted RFRA and by the signatories to the Convention when they authorized exemptions for religious use of otherwise prohibited substances.[6] It

_____

[6]Lending their voice as *amici curiae* in support of the UDV's position are a variety of other religious organizations. Among these groups are the Christian
(continued...)

cannot go without comment that Congress, in response to the Supreme Court's

ruling in *Employment Division v. Smith*, 492 U.S. 872 (1990), enacted RFRA to

overturn the holding in that case. As noted by the panel, the Supreme Court held

in *Smith* that the "Free Exercise Clause of the First Amendment did not require the

State of Oregon to exempt from its criminal drug laws the sacramental ingestion of

peyote by members of the Native American Church." *O Centro*, 342 F.3d at 1176

(citing *Smith*, 492 U.S. at 885-890). According to *Smith*, "[g]enerally applicable

laws . . . . [could] be applied to religious exercises regardless of whether the

government [demonstrated] a compelling interest" for enforcing the law. *Id.* In

response, Congress passed RFRA to restore the compelling interest test articulated

in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205

(1972).[7] Thus, pursuant to RFRA, there is a strong public interest in the free

exercise of religion even where that interest may conflict with the CSA.[8]

---

[6](...continued)
Legal Society, the National Association of Evangelicals, Clifton Kirkpatrick, as the Stated Clerk of the General Assembly of the Presbyterian Church, and the Queens Federation of Churches, Inc. The presence of these varied groups as advocates for the UDV further highlights the vital public interest in protecting a citizen's free exercise of religion.

[7]The Supreme Court has subsequently found RFRA unconstitutional as applied to the states. *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). However, RFRA is still applicable to the federal government. *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001).

[8]Judge Murphy relies heavily on Congress' specific findings that the
(continued...)

-27-

For all the reasons stated above, even under the heightened standard affirmed by a majority of this court, the district court did not abuse its discretion in granting the injunction to the church. The court held that

> in balancing the Government's concerns [regarding harm] against the injury suffered by the [church] when [its members are] unable to consume hoasca in their religious ceremonies, this Court concludes that, in light of the closeness of the parties' evidence regarding the safety of hoasca use and its potential for diversion, the scale tips in the [church's] favor.

---

[8](...continued)
importation and consumption of controlled substances are adverse to the public interest, *see* Murphy, J., opin. at 38-39, while totally ignoring the immediate and strong reaction Congress had to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). The Congressional findings accompanying RFRA explicitly state that

> the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution; . . . laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise; . . . [and] governments should not substantially burden religious exercise without compelling justification.

42 U.S.C. § 2000bb(a)(1)-(3). Congress went on to express its displeasure with the Supreme Court's decision in *Smith* and stated that the compelling interest test set out in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), struck a "sensible balance[] between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(4)-(5).

In making this observation, I do not assert, as Judge Murphy suggests, that Congress' findings in conjunction with its passage of the CSA are totally irrelevant, or that the dissent erred in its reference to them. *See* Murphy, J., opin. at 39 n.13. Rather, it is my position that the findings articulated by Congress in the CSA cannot be viewed without reference to Congress' adamant affirmation that the free exercise of religion is an unalienable right to be burdened only under the most compelling of government justifications.

*O Centro*, 282 F. Supp. 2d at 1270. It also noted that by issuing the injunction, the public's interest in the protection of religious freedoms would be furthered. *Id.* The district court's ruling is appropriate in light of Congress' implicit RFRA determination that the harm prevented and public interest served by protecting a citizen's free exercise of religion must be given controlling weight, barring the government's proof, by specific evidence, that its interests are more compelling. Here, the government failed to overcome Congress' determination.

No. 02-2323, *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft.*

**McCONNELL**, J., joined by **TYMKOVICH**, J., concurring, and joined by **HARTZ**, J., and **O'BRIEN**, J., as to Part I.


This Court has traditionally required a heightened showing for preliminary injunctions in three "disfavored" categories: injunctions that disturb the status quo, mandatory injunctions, and injunctions that afford the movant substantially all the relief it may recover at the conclusion of a full trial on the merits. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098-99 (10th Cir. 1991). We heard this case en banc to consider whether to jettison the heightened standard for preliminary injunctions that disturb the status quo. A majority of this Court has concluded that there are reasons—not fully accounted for in the balance of harms analysis—for courts to disfavor preliminary injunctions that disturb the status quo, and thus reaffirms our traditional rule (with slight modification and clarification). See Opinion of Murphy, J., at 1-10. A different majority has concluded that, even under the heightened standard, Appellee O Centro Espirita Beneficiente Uniao do Vegetal ("UDV") is entitled to a preliminary injunction against enforcement of laws against the possession and use of its sacramental substance, *hoasca*. Opinion of Seymour, J., at 28. I write separately to explain why both halves of this holding, in my opinion, are correct.[1]

---

[1] Judges Seymour and Murphy have each written opinions that concur in part of the holding of the en banc court and dissent from the other part. For

(continued...)

**1.    A Heightened Standard Should Apply to Preliminary Injunctions That Disturb the Status Quo**

The Supreme Court has stated that preliminary injunctions have the "limited purpose" of "merely [preserving] the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). This emphasis on preserving the status quo is not the same as, and cannot be reduced to, minimizing irreparable harm to the parties during the pendency of litigation, as suggested by the dissent. See Opinion of Seymour, J., at 5-6. At the preliminary injunction stage, before there has been a trial on the merits, the function of the court is not to take whatever steps are necessary to prevent irreparable harm, but primarily to keep things as they were, until the court is able to determine the parties' respective legal rights. That is why, in addition to the four preliminary injunction factors of harm to the movant, balance of harm, public interest, and likelihood of success on the merits, this Court has required district courts to take into account whether preliminary relief would preserve or disturb

_____

[1](...continued)
convenience, I will refer to those portions of these opinions that dissent from the en banc holding as a "dissent," and to those portions that concur in the holding as a "concurrence." I join the per curiam opinion in its entirety. I join Part I of Judge Murphy's separate opinion, and Part II of Judge Seymour's separate opinion, on the understanding that the analysis holds "even under the heightened standard affirmed by a majority of this court." Opinion of Seymour, J., at 28.

the status quo.  The burden of justifying preliminary relief is higher if it would disturb the status quo.  *SCFC ILC, Inc.*, 936 F.2d at 1098-99.

There is no reason to think that the "general maxim" that "the purpose of a preliminary injunction is to preserve the status quo between the parties pending a full trial on the merits" is one that "should not be taken merely at face value" or disregarded except insofar as it "impacts the balance of harms between the parties and the public interest."  Opinion of Seymour, J., at 6, 7.  A judicial version of Hippocrates' ancient  injunction to physicians – above all, to do no harm – counsels against forcing changes before there has been a determination of the parties' legal rights.  The settled rule of our tradition is that losses should remain where they fall until an adequate legal or equitable justification for shifting them has been demonstrated.

Traditional equity practice held that the *sole* purpose of a preliminary injunction was to preserve the status quo during the pendency of litigation.  *See, e.g.*, *Farmers' R.R. Co. v. Reno, Oil Creek & Pithole Ry.* Co., 53 Pa. 224 (Pa. 1866) (dissolving an injunction that blocked defendants from continuing to use certain land in their possession because the sole purpose of a preliminary injunction is to preserve the status quo); *Chicago, St. Paul & Kansas City R.R. Co. v. Kansas City, St. Joseph & Council Bluffs R.R. Co.*, 38 F. 58, 60 (C.C.W.D. Mo. 1889) (noting that a higher standard applies to mandatory injunctions that disrupt

-3-

the status quo); *New Orleans & North Eastern R.R. Co. v. Mississippi, Terre-aux Boeufs & Lake R.R. Co.*, 36 La. Ann. 561 (La. 1884) (maintaining an injunction insofar as it maintained the status quo, but dissolving that portion that did not); *Warner Bros. Pictures v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) (per curiam) ("Irreparable loss resulting from refusal to accord the plaintiff a new status, as distinguished from interference with rights previously enjoyed by him, does not furnish the basis for interlocutory relief."); *Levy v. Rosen*, 258 Ill. App. 262 (Ill. App. Ct. 1930) ("An interlocutory order is usually granted to preserve the *status quo*, but the order in this appeal did not do that, but changed the *status quo*. The entry of such order was clearly erroneous."); *Gill v. Hudspeth County Conservation & Reclamation Dist. No. 1*, 88 S.W.2d 517, 519 (Tex. Civ. App. 1935) ("[T]he court's discretion should be exercised against the writ if its issuance would change the status quo."); *Bowling v. Nat'l Convoy & Trucking Co.*, 135 So. 541 (Fla. 1931) ("Since the object of a preliminary injunction is to preserve the status quo, the court will not grant such an order where its effect would be to change the status."); *Gates v. Detroit & Mackinac Ry. Co.*, 115 N.W. 420, 421 (Mich. 1908) (dissolving that portion of a preliminary injunction that went beyond the status quo); *Jones v. Dimes*, 130 F. 638, 639 (D. Del. 1904) (relaxing the burden on the moving party when the requested injunction merely maintained the status quo);1 James L. High, *A Treatise on the Law of Injunctions* (Chicago:

-4-

Callaghan & Co. 1890, 3d ed.) § 4 at 5 ("The sole object of an interlocutory injunction is to preserve the subject in controversy in its then condition, and, without determining any questions of right").

To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions. Such an injunction restores, rather than disturbs, the status quo ante, and is thus not an exception to the rule. "Status quo" does not mean the situation existing at the moment the law suit is filed, but the "last peaceable uncontested status existing between the parties before the dispute developed." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995).[2] Thus, courts of equity have long issued preliminary injunctions requiring parties to *restore* the status quo ante. *Shanaman v. Yellow Cab Co.*, 421 A.2d 664, 667 (Pa. 1980) (reversing a preliminary injunction because "the purpose of a mandatory preliminary injunction is to restore the status quo" and the injunction actually disrupted that status); *Morgan v. Smart*, 88 S.W.2d 769, 772 (Tex. Civ. App. 1935) ("[T]here are no real exceptions to the rule that the status quo will not be disturbed by a preliminary injunction, and when by such an injunction the possession of

---

[2]This, too, is a traditional principle of equity practice. *See, e.g., Fredericks v. Huber*, 37 A. 90, 91 (Pa. 1897); *Bowling v. Nat'l Convoy & Trucking Co.*, 135 So. 541, 544 (Fla. 1931); *Bellows v. Ericson*, 46 N.W.2d 654, 659 n.9 (Minn. 1951); *State ex rel. McKinley Automotive, Inc. v. Oldham*, 584 P.2d 741, 743 n.3 (Or. 1978); *Weis v. Renbarger*, 670 P.2d 609, 611 (Okla. Ct. App. 1983).

property is properly ordered to be restored it is not to disturb the status quo, but to avoid mistaking the true status and to avoid preserving a false one.").

In recent decades, most courts – and all federal courts of appeal – have come to recognize that there are cases in which preservation of the status quo may so clearly inflict irreparable harm on the movant, with so little probability of being upheld on the merits, that a preliminary injunction may be appropriate even though it requires a departure from the status quo. *See, e.g., Canal Authority v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).[3]  But preliminary injunctions that disturb the status quo, while no longer categorically forbidden, remain disfavored.  Only one federal court of appeals has concluded that courts should simply strive to minimize irreparable harm, with no special attention to the status quo, as our dissenters suggest.  *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998); *see* Opinion of Seymour, J., at 12.[4]

_____

[3]Some states continue to make preservation of the status quo a necessary requirement for all preliminary injunctions. *See, e.g.*, *Postma v. Jack Brown Buick, Inc.*, 626 N.E.2d 199, 203 (Ill. 1993) (stating categorically that "preliminary injunctions are improper where they tend to change the status quo of the parties rather than preserve it"); *County of Richland v. Simpkins*, 560 S.E.2d 902, 906 (S.C. Ct. App. 2002) (noting that the sole purpose of a preliminary injunction is to preserve the status quo, and affirming the denial of an injunction that would change that status).

[4]I am puzzled by the dissent's suggestion that abandoning heightened scrutiny for preliminary injunctions that disturb the status quo would "bring our

(continued...)

There are sound reasons of jurisprudence in support of the traditional view that preliminary injunctions that disturb the status quo require heightened justification. A preliminary injunction of any sort is an "extraordinary" and

[4](...continued)
jurisprudence in closer accord" with "other circuits." Opinion of Seymour, J., at 4-5, *citing In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003); *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34-35 (2d Cir. 1995); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980); *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1980). Certainly that is not true of the Second Circuit. In the very opinion cited by the dissent, *Tom Doherty*, the Second Circuit states:

> [W]e have required the movant to meet a higher standard where: (i) *an injunction will alter, rather than maintain, the status quo*, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.

60 F.3d at 33-34 (emphasis added). The other cited circuits blend the disfavored categories of mandatory injunctions and those that disturb the status quo, but continue to treat the latter as requiring a heightened showing. For example, the Third Circuit decision cited by the dissenters holds as follows:

> A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered. A mandatory preliminary injunction compelling issuance of a building permit fundamentally alters the status quo. . . . *A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.*"

*Acierno v. New Castle County*, 40 F.3d at 647, 653 (emphasis added; citation omitted). The other cited cases are to similar effect. *See Anderson v. United States,* 612 F.2d at 1114-15 ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."); *In re Microsoft Corporation Antitrust Litigation,* 333 F.3d at 526 ("Mandatory preliminary injunctions [generally] do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief."), *quoting Wetzel v. Edwards,* 635 F.2d at 286.

"drastic" remedy. *See United States ex rel. Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989). Judicial power is inseparably connected with the judicial duty to decide cases and controversies by determining the parties' legal rights and obligations. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). A preliminary injunction is remarkable because it imposes a constraint on the enjoined party's actions in advance of any such determination. That is, a preliminary injunction forces a party to act or desist from acting, not because the law requires it, but because the law *might* require it. This is all the more striking because, given that many preliminary injunctions must be granted hurriedly and on the basis of very limited evidence, deciding whether to grant a preliminary injunction is normally to make a choice under conditions of grave uncertainty. *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

It is one thing for a court to preserve its power to grant effectual relief by preventing parties from making unilateral and irremediable changes during the course of litigation, and quite another for a court to force the parties to make significant alterations in their practices before there has been time for a trial on the merits. *See, e.g.*, *Gittone*, 110 F.2d at 293 ("[T]he effect of the preliminary injunction which the court granted was not to preserve the status quo but rather to alter the prior status of the parties fundamentally. Such an alteration may be

directed only after final hearing."); *In re Marriage of Schwartz*, 475 N.E.2d 1077, 1079 (Ill. App. Ct. 1985) ("It is not the purpose of the preliminary injunction to determine controverted rights or decide the merits of the case. . . . A preliminary injunction is merely provisional in nature, its office being merely to preserve the status quo until a final hearing on the merits.").

Moreover, preserving the status quo enables the court to stay relatively neutral in the underlying legal dispute. The restrictions placed on the parties can be understood as requiring only that they act in a manner consistent with the existence of a good-faith dispute about the relevant legal entitlements. The moving party is not given any rights, even temporarily, that would normally be his only if the legal dispute were resolved in his favor. For example, ownership disputes often raise concerns that the defendant in possession would overuse or waste the property before a complainant could regain possession through legal proceedings. Under those circumstances, equitable courts regularly enjoin the waste, ordering the defendant to preserve the property in *statu quo*. The general rule, however, is that except in the most exceptional cases, a court of equity cannot go beyond the status quo by putting the moving party into possession of the disputed property, even though, presumably, being deprived of the interim ability to enjoy the property would often constitute irreparable harm. *See, e.g.*, *Farmers' R.R. Co.*, *supra*; *Morgan v. Smart*, 88 S.W.2d 769, 771 (Tex. Civ. App. 1935) ("It

is not the function of a preliminary injunction to transfer the possession of land from one person to another pending an adjudication of the title, except in cases in which the possession has been forcibly or fraudulently obtained . . . [and the injunction is necessary so that] the original status of the property [may] be preserved pending the decision of the issue."), *quoting Simms v. Reisner*, 134 S.W. 278, 280 (Tex. Civ. App. 1911). *See generally Mandatory Injunction Prior to Hearing of Case*, 15 A.L.R.2d 213, §§ 22-23 (collecting dozens of cases on this issue).

Fundamentally, the reluctance to disturb the status quo prior to trial on the merits is an expression of judicial humility. As Judge Murphy points out, a court bears more direct moral responsibility for harms that result from its intervention than from its nonintervention, and more direct responsibility when it intervenes to change the status quo than when it intervenes to preserve it. *See* Opinion of Murphy, J., at 5. Moreover, like the doctrine of *stare decisis*, preserving the status quo serves to protect the settled expectations of the parties. Disrupting the status quo may provide a benefit to one party, but only by depriving the other party of some right he previously enjoyed. Although the harm and the benefit may be of equivalent magnitude on paper, in reality, deprivation of a thing already possessed is felt more acutely than lack of a benefit only hoped for. As the Supreme Court observed in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 282-83 (1986),

-10-

"[d]enial of a future employment opportunity is not as intrusive as loss of an

existing job." Percipient students of human nature have often made similar

observations. David Hume, for example, wrote:

> Such is the effect of custom, that it not only reconciles us to any thing
> we have long enjoy'd, but even gives us an affection for it, and makes
> us prefer it to other objects, which may be more valuable, but are less
> known to us What has long lain under our eye, and has often been
> employ'd to our advantage, *that* we are always the most unwilling to
> part with; but can easily live without possessions, which we never
> have enjoy'd, and are not accustom'd to.

David Hume, *A Treatise of Human Nature*, bk. 3, pt. 2, § 3, para. 4 (1739). *See*

*also, e.g.*, Aristotle, *Nichomachean Ethics*, bk. IX, ch. 1, at 1164b17-19 (W.D.

Ross trans.), *in The Basic Works of Aristotle* (Richard McKeon ed., 1941) ("For

most things are not assessed at the same value by those who have them and those

who want them; each class values highly what is its own . . . ."). Justice Holmes

has justified the doctrine of adverse possession on these grounds:

> [T]he foundation of the acquisition of rights by lapse of time is to be
> looked for in the position of the person who gains them, not in that of
> the loser. . . . A thing which you have enjoyed and used as your own
> for a long time, whether property or an opinion, takes root in your
> being and cannot be torn away without your resenting the act and
> trying to defend yourself, however you came by it. The law can ask
> no better justification than the deepest instincts of man.

Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 477

(1897).

Notwithstanding the tendency of those trained in economics to view opportunity costs as equivalent to actual expenditures, modern social science research has confirmed the reality of "loss aversion" (the tendency to attach greater value to losses than to foregone gains of equal amount) and the closely related "endowment effect" (the tendency to value already possessed goods more than prospective acquisitions). *See, e.g.*, Daniel Kahneman, Jack L. Knetsch & Richard H. Thaler, *The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 *J. Econ. Persp.* 193 (1991); Amos Tversky & Daniel Kahneman, *Loss Aversion in Riskless Choice: A Reference-Dependent Model*, 106 *Q.J. Econ.* 1039 (1991); Daniel Kahneman et al., *Experimental Tests of the Endowment Effect and the Coase Theorem*, 98 *J. Pol. Econ.* 1352 (1990); Jack L. Knetsch & J.A. Sinden, *Willingness to Pay and Compensation Demanded: Experimental Evidence of an Unexpected Disparity in Measures of Value*, 99 *Q.J. Econ.* 507, 512-13 (1984). To take one of many illustrations, one study found that duck hunters would pay, on average, $247 to obtain the privilege of keeping a particular wetland undeveloped, but if they already had the right to block development, they would demand an average of $1,044 to give it up. Judd Hammack & Gardner M. Brown, Jr., *Waterfowl and Wetlands: Toward Bioeconomic Analysis* 26 (1974).

Moreover, adverse disruptions in the status quo carry along with them the cost and difficulty associated with adjusting to change. These involve not only

direct transition costs but also the costs associated with uncertainty, which manifest themselves in a reluctance to invest human or other capital in an enterprise where the returns could disappear at the drop of a judicial hat. Disruption is expensive. When a court requires a change in the status quo only to find that its grant of preliminary relief was mistaken and must be undone, the process is twice as disruptive as when the court preserves the status quo on a preliminary basis and later issues a final judgment requiring the change.

The status quo is also relevant to the credibility of the parties' claims of irreparable harm. It is difficult to measure irreparable harm, and either party's willingness to put up with a situation in the past can serve as an indication that the party's injury is not as serious as alleged, or that the party has implicitly consented to the supposed injury. *See Heideman*, 348 F.3d at 1191 ("[T]he City has tolerated nude dancing establishments for many years . . . . This invites skepticism regarding the imperative for immediate implementation [of a new ordinance]."); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) (noting that while delay alone is not enough to constitute laches, it is ground for doubting a claim of irreparable harm). Plaintiffs, especially, have the burden of complaining of injuries promptly, before defendants come to rely on the status quo. "[E]quity aids the vigilant, not those who slumber on their rights." *Allred v. Chynoweth*, 990 F.2d 527, 536 n.6 (10th Cir. 1993); *Standard Oil Co. of N.M. v. Standard Oil Co.*

*of Cal.*, 56 F.2d 973, 975 (10th Cir.1932); *Natural Res. Defendant Council v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998).  Thus, when a plaintiff is complaining of irreparable injury from a long-established state of affairs, a court may naturally ask why, if the injury is so pressing as to warrant preliminary relief, the plaintiff waited so long before bringing a claim.  11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2946, at 113-16 (2d ed. 1995); *Edward & John Burke, Ltd. v. Bishop*, 144 F. 838, 839 (2d Cir. 1906); *Savage v. Port Reading R.R. Co.*, 67 A. 436, 438 (N.J. Ch. 1907).

The status quo is also a useful reference point because litigants often have incentives to engage in counterproductive strategic behavior.  A defendant facing the loss of property, for example, has a natural incentive to extract as much of the value of the land as possible before losing possession, even in ways that limit the land's productivity for years to come.  And even when doing so produces no advantages to the defendant, it is an unfortunate reality of human nature that many defendants would prefer to destroy the property in question than to let their adversary have the use of it, both out of spite and as a way of making the resort to the courts less attractive in the first place.

Likewise, plaintiffs have incentives to seek injunctions not only to avert irreparable harm to themselves, but also to impose costs on the other party.  This, too, may be done out of spite, or because the higher the costs to the defendant in

-14-

complying, the more pressure he will feel to "bargain desperately to buy his way out of the injunction." *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 594 (7th Cir. 1986).  A preliminary injunction aims in part at achieving temporary peace between the parties.  However, if it substantially shifts the lines of conflict, it is more likely to function as a weapon in the plaintiff's arsenal than as a cease-fire.  Preserving the last peaceable uncontested status of the parties maintains a position to which both parties at least tacitly consented before their dispute, and its concomitant perverse incentives, arose.

Without a heightened standard, these concerns will likely not be given due weight.  In the context of the balance of harms analysis, it is all too easy to stop at comparing the absolute magnitudes of the parties' irreparable harms, without distinguishing between foregone gains and actual losses, and without considering whether granting an injunction implicates other institutional concerns about the proper role of the courts.  Unless the district court self-consciously takes the nature of the injunction into account by applying a heightened standard, the four factors likely will lead to an overconfident approach to preliminary relief, increasing the cost and disruption from improvidently granted preliminary injunctions.

A particularly important category of cases where the status quo will often be determinative of whether a court should provide preliminary relief is challenges to

the constitutionality of statutes. When a statute is newly enacted, and its enforcement will restrict rights citizens previously had exercised and enjoyed, it is not uncommon for district courts to enjoin enforcement pending a determination of the merits of the constitutional issue. *See, e.g., Eagle Books, Inc. v. Ritchie*, 455 F.Supp. 73, 77-78 (D. Utah 1978); *Reproductive Services v. Keating*, 35 F.Supp.2d 1332, 1337 (N.D. Okla. 1998); *ACLU v. Johnson*, 194 F.3d 1149, 1152 (10th Cir.1999); *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076-77 (10th Cir. 2001); *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347-48 (10th Cir. 1997) (per curiam). When a statute has long been on the books and enforced, however, it is exceedingly unusual for a litigant who challenges its constitutionality to obtain (or even to seek) a preliminary injunction against its continued enforcement. *See, e.g.*, *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (Rehnquist, Circuit Justice 1984) ("It would take more than the respondents have presented in their response . . . to persuade me that the action of a single District Judge declaring unconstitutional an Act of Congress that has been on the books for more than 120 years should not be stayed . . . ."). This is not because the balance of harms to the litigants is different. Presumably, the loss of constitutional rights from enforcement of an old statute is no less harmful or irreparable than from enforcement of a new. The dissent's suggested approach of considering the status quo only insofar as it bears on "the process of balancing the

-16-

various interests and harms among the parties and the public," (Opinion of Seymour, J., at 7), without a heightened standard, is thus likely to yield the conclusion that it does not matter whether the statute is old or new. That would be a dramatic change in our practice. The reason for weighing the status quo is not to be found in the four preliminary injunction factors. It is rooted, instead, in the institutional concerns we have canvassed above.

I thus join in the en banc court's decision to continue to require litigants seeking a preliminary injunction, that would alter the status quo, to meet a heightened burden of justification.

## II. Does this Preliminary Injunction Satisfy the Heightened Standard?

This case satisfies even the heightened standard for preliminary injunctions. The applicable statute, the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(b), sets a most demanding burden of proof for the government: the compelling interest test. The factual findings of the district court, which are not challenged on appeal, make it clear that the government has not and cannot meet that burden on this record, and that the balance of equities is overwhelmingly in favor of the movant. The en banc majority is therefore right, in my opinion, to affirm the district court's grant of a preliminary injunction.

Plaintiffs establish, and the government does not dispute, that enforcement of the CSA in this context would impose a substantial burden on a sincere exercise

of religion.  It is common ground that such a burden constitutes irreparable injury.

The plaintiffs have thus established a prima facie case (relevant to the probability

of success on the merits) and an irreparable injury (relevant to the balance of

harms).  It is also common ground that the evidence at the hearing regarding the

government's assertions of an interest in the health of *hoasca* users and the

prevention of diversion to recreational drug users was in "equipoise" and

"virtually balanced."  What is not common ground is the effect of evenly-balanced

evidence regarding possible harms from *hoasca* use on UDV's ultimate likelihood

of success on the merits, and on the balancing of the equities required for the grant

of a preliminary injunction.

A

The dissent insists that the government is more likely to prevail on the

merits than is UDV.  In Judge Murphy's formulation, the government's interest in

the uniform enforcement of drug laws and its interest in full compliance with the

obligations imposed by international treaties are sufficient to meet the compelling

interest standard.  He is silent on whether, even if the government's interests in

enforcement and compliance were adjudged compelling, the government has

employed the least restrictive means at its disposal, as RFRA requires.  42 U.S.C.

2000bb-1(b)(2).

The dissent is premised on the view that "RFRA was never intended to result in [a] case-by-case evaluation of the controlled substances laws, and the scheduling decisions made pursuant to those laws . . . . [i]t is particularly improper for the court to assume such a function in this case." Opinion of Murphy, J., at 18. On the contrary, that is precisely what RFRA instructs courts to do. The dissent does not make clear whether it interprets RFRA as precluding "case-by-case evaluation" in all contexts, or whether this is a special rule for controlled substance cases. Neither interpretation is tenable.

In cases where federal law "substantially burdens" the exercise of religion, RFRA requires courts to determine whether "*application* of the burden" to a specific "person" is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1(b) (emphasis added). That cannot be done without a case-by-case evaluation. "Thus, under RFRA, a court does not consider the . . . regulation in its general application, but rather considers whether there is a compelling government reason, advanced in the least restrictive means, to apply the . . . regulation to the individual claimant." *Kikumura v. Hurley*, 242 F.3d 950, 962 (10th Cir. 2001) (Murphy, J.). Accordingly, contrary to the dissent, Congress's general conclusion that DMT is dangerous in the abstract does not establish that the government has a

compelling interest in prohibiting the consumption of *hoasca* under the conditions presented in this case.

Nor is there an implied exemption from RFRA in cases involving the controlled substances laws. By its terms, RFRA applies to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after [enactment of RFRA]," unless the law "explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb–3(a), (b). The CSA contains no such explicit exception.

Judge Murphy argues that "courts simply lack the institutional competence to craft a set of religious exemptions to the uniform enforcement" of the drug laws. Opinion of Murphy, J., at 18. But the same may be said for application of RFRA to virtually any field of regulation that may conflict with religious exercise. Whatever our justifiably low opinion of our own competence, we are not free to decline to enforce the statute, which necessarily puts courts in the position of crafting religious exemptions to federal laws that burden religious exercise without sufficient justification.

The dissent's notion that the drug laws are impliedly exempt from RFRA scrutiny is especially surprising in light of the fact that the impetus for enactment of RFRA was the Supreme Court's decision in a case involving the sacramental use of a controlled substance. See Congressional Findings and Declaration of

Purposes, 42 U.S.C. § 2000bb(a)(4) (criticizing *Employment Division v. Smith*, 494 U.S. 872 (1990)). It may well be that most examples of enforcement of the drug laws will satisfy strict scrutiny under RFRA, see *id*. at 903-07 (O'Connor, J., concurring) (applying strict scrutiny to, and upholding, the application of Oregon drug laws to the Native American Church's sacramental use of peyote), but it can scarcely be clearer that Congress intended such scrutiny to occur.

The dissent asserts that courts applying the compelling interest test both before and after RFRA have "routinely rejected religious exemptions from laws regulating controlled substances," and that "the same result should obtain in this case." Opinion of Murphy., J., at 20–21 (citing cases). There is no support in the cases cited, however, for the proposition that any religious use of any drug is outside the scope of RFRA (or, before *Smith*, free exercise) protection. Four of the five pre-RFRA cases cited involve the same group, the Ethiopian Zion Coptic Church, which advocated the use of marijuana "continually all day, through church services, through everything [they] do." *Olsen v. Drug Enforcement Admin.*, 878 F.2d 1458, 1459 (D.C. 1989). The constant and uncircumscribed use of a drug presents different health risks and risks of diversion than the use of *hoasca* suggested by UDV. The significance of these differences is underscored by the conviction of the Ethiopian Zion Coptic Church for the importation of twenty tons of marijuana. *United States v. Rush*, 738 F.2d 497, 501 (1st Cir. 1984). The post-

-21-

RFRA cases cited offer no more support for the proposition that the findings of the CSA will always outweigh the interest in a particular religious use. In *U.S. v. Brown*, 1995 WL 732803, *2, for example, the Eighth Circuit found that the "broad use" of marijuana advocated by the church in question, which included supplying the drug to the sick and distributing it to anyone who wished it, including children with parental permission, made accommodation impossible. Both the unconstrained character of the proposed use and the popularity of marijuana affected the outcome in these cases: "the vast difference in demand for marijuana on the one hand and peyote on the other warranted the DEA's response [in declining to grant an exception.]" *Olsen v. DEA* at 1463–64. These cases accordingly provide very little insight into the appropriate result when the standard required by RFRA is applied to a case involving a tightly circumscribed use of a drug not in widespread use.

Even assuming RFRA's compelling interest test applies, the dissent takes the position that "the government need turn only to express congressional findings concerning Schedule I drugs" to satisfy RFRA scrutiny. Opinion of Murphy, J., at 18. The dissent cites no authority for such an approach, and there is none. Congressional findings are entitled to respect, but they cannot be conclusive. RFRA requires *the government* to "demonstrate[]" that application of a challenged federal law to religious exercise satisfies strict scrutiny under RFRA. 42 U.S.C. §

2000bb-1(b). The term "demonstrates" is defined as "meet[ing] the burdens of going forward with the evidence and of persuasion." Id., § 2000bb-2(3). Obviously, Congress contemplated the introduction of "evidence" pertaining to the justification of "application" of the law in the particular instance. If such a burden of proof could be satisfied by citing congressional finding in the preambles to statutes, without additional evidence, RFRA challenges would rarely succeed; congressional findings invariably tout the importance of the laws to which they are appended.

The dissent points to two such congressional findings. First, Congress has made a general finding that the "illegal importation . . . and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." Opinion of Murphy, J., at 18–19. Second, Congress has placed DMT on the list of Schedule I controlled substances, which implies that it "has high potential for abuse and is not safe to consume even under the supervision of medical personnel." Id. These generalized expressions of the government's interest in prohibiting *hoasca* are very similar to the sweeping statements of interest that the Supreme Court found wanting in *Wisconsin v. Yoder*, 406 U.S. 205 (1972) – one of the cases to which Congress referred as illustrating the compelling interest test it wished to "restore" by means of RFRA. *See* § 2000bb(b)(1). In that case, the Supreme Court rejected the State

-23-

of Wisconsin's "contention that its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way":

> Where fundamental claims of religious freedom are at stake, however, we cannot accept such a sweeping claim; despite its admitted validity in the generality of cases, we must *searchingly examine* the interests that the State seeks to promote by its requirement for compulsory education to age 16, and the impediment to those objectives that would flow from recognizing the claimed Amish exemption.

406 U.S. at 221 (emphasis added).  A similarly "searching examination" is required here, and can no more be satisfied by quotation of "sweeping claim[s]" in statutory preambles than it could in *Yoder*.

If Congress or the executive branch had investigated the religious use of *hoasca* and had come to an informed conclusion that the health risks or possibility of diversion are sufficient to outweigh free exercise concerns in this case, that conclusion would be entitled to great weight.  But neither branch has done that. The two findings on which the dissent relies address the broad question of the dangers of *all* controlled substances, or all Schedule I substances, in the general run of cases.  Such generalized statements are of very limited utility in evaluating the specific dangers of *this* substance under *these* circumstances, because the dangers associated with a substance may vary considerably from context to context.

-24-

Congress itself recognized this and gave the Attorney General authority to make exemptions from many of the CSA's requirements:

> The Attorney General may, by regulation, waive the requirement for registration of certain manufacturers, distributors, or dispensers *if he finds it consistent with the public health and safety*.

21 U.S.C. § 822(d) (emphasis added). Thus, the CSA itself recognizes that, despite Congress's general findings about Schedule I substances, it may sometimes be "consistent with the public health and safety" to exempt certain people from its requirements. Indeed, the government evidently believed this to be true with respect to the Native American Church's peyote use, since it relied primarily on § 822(d) to authorize its regulation exempting the Native American Church from the CSA. *See* 21 C.F.R. § 1307.31 ("The listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote *are exempt from registration*." (emphasis added)).

Judge Murphy responds that 21 U.S.C. § 822(d) should not be construed as giving the Attorney General authority to exempt religious groups other than the Native American Church from registration without specific authorization from Congress, because the "government's regulatory exemption for peyote . . . was at all times a product of congressional will." Opinion of Murphy, J., at 24. I think he

is wrong about the scope of the Attorney General's authority under § 822(d),[5] but that is not the point. Even if in practice the only religious exemption authorized by § 822(d) were for the Native American Church, the plain text of that provision indicates Congress's belief that at least some use of substances controlled by the Act are "consistent with the public health and safety," despite the generalized congressional finding that any Schedule I substance is not safe to consume even under the supervision of medical personnel. 21 U.S.C. §812(b)(1)(C). More recently, Congress has passed legislation requiring the states to allow the Native American Church to use peyote, a Schedule I substance, in religious ceremonies. *See* American Indian Religious Freedom Act Amendments of 1994, 42 U.S.C. § 1996a. Congress's consistent position has been that concerns for religious freedom can sometimes outweigh risks that otherwise justify prohibiting Schedule I substances. Neither Congress nor the Executive has treated the CSA's general

---

[5]The text and legislative history of the CSA suggest that Congress meant to give the Attorney General authority to make other religious exemptions. *See generally Native American Church v. United States*, 468 F. Supp. 1247, 1249-51 (S.D.N.Y. 1979) (recounting the legislative history of the exemption for the Native American Church). As Judge Murphy notes, Opinion of Murphy, J., at 24, this precise question was presented in *Olsen v. DEA*, 878 F.2d 1458 (D.C. Cir. 1989). In that case, now-Justice Ginsburg refused to accept the DEA's position that it had the authority to exempt the Native American Church but no other churches, noting that the DEA's interpretation preferred one church above others in a way that would raise serious questions concerning the statute's constitutionality. *See id.* at 1461.

findings about Schedule I substances as precluding a particularized assessment of the risks involved in a specific sacramental use. Neither should we.

Several factors make *hoasca* atypical in its likely health consequences. For instance, although DMT is typically taken intravenously or inhaled in the nonreligious settings that Congress presumably had in mind when it proscribed the substance, UDV members ingest it orally. There was some evidence at the hearing that the resulting doses are considerably smaller than typical intravenous or inhaled doses, and there has been very little study of the effects of orally ingested DMT. Furthermore, the fact that *hoasca* is a relatively uncommon substance used almost exclusively as part of a well-defined religious service makes an exemption for bona fide religious purposes less subject to abuse than if the religion required its constant consumption, or if the drug were a more widely used substance like marijuana or methamphetamine. *Cf. Employment Div. v. Smith*, 494 U.S. 872, 913-14 (1990) (Blackmun, J., dissenting). These and other differences undermine any claim that, in placing DMT on Schedule I, Congress made a factual finding that should control our assessment of the relative dangerousness of *hoasca*.

Judge Murphy expresses disbelief that a claimant's rights under RFRA could "turn on whether the adherent has a religious affinity for street drugs or more esoteric ones." Opinion of Murphy, J., at 26. Of course it is true that in theory, at least, it is possible to have the same religious interest in shooting heroin as in

drinking *hoasca*. But one's rights under RFRA depend not only on the nature of the religious interest but also on the strength of the government's opposed interest. Here, the government's professed interests include avoiding diversion to nonreligious use and ensuring that a multitude of spurious free exercise claims do not hamstring its enforcement efforts. Given those concerns, I do not see why Judge Murphy finds it surprising that the extent of nonreligious use is relevant to the analysis. Indeed, it would be far more surprising if the differences between street drugs and more "esoteric" ones were *irrelevant*. *See Olsen v. DEA*, 878 F.2d 1458, 1464 (D.C. Cir. 1989) (R. Ginsburg, J.) ("[W]e rest our decision [not to grant an exemption for religious marijuana consumption] on the immensity of the marijuana control problem in the United States . . . .").

Finally, the dissent also urges that the government's interest in strict compliance with the 1971 United Nations Convention on Psychotropic Substances, Feb. 21, 1971, 32 U.S.T. 543 (the "Convention") is sufficiently compelling to outweigh the burden imposed on UDV. The district court held that the Convention does not apply to the hoasca tea used by UDV. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F.Supp.2d 1236, 1269 (D. New Mexico 2002). Judge Murphy categorically asserts the opposite, based on the "plain language of the Convention." Opinion of Murphy, J., at 30.

To reverse on the basis of the Convention would require us to go far beyond what the record can support. After reviewing the initial briefs filed by the parties, the district court determined that the government's strongest grounds for prohibiting UDV from using *hoasca* were based on concerns about the safety of drinking the tea and the risk of diversion to non-religious uses. 282 F. Supp. 2d at 1266. The court therefore limited evidence to those issues. Plaintiffs attempted to present evidence regarding the interpretation of the Convention by the International Narcotics Control Board, the international enforcing agency, including a letter by the Secretary of the Board stating that *hoasca* is not controlled under the Convention. The government objected on the ground that "We are now introducing testimony about whether or not ayahuasca is controlled under the International Convention. That is not one of the issues in this hearing." Supp. App. 1634. After discussion, the district court forbade questioning on the subject, and plaintiffs were unable to introduce evidence on the interpretation of the Convention by the Board. For this Court to attempt to interpret a complex treaty on the basis of its "plain language," without the benefit of its interpretive history, would be premature.

More to the point, the government utterly failed to carry its statutory burden (42 U.S.C. § 2000bb-1(b)(2)) of demonstrating that complete prohibition of hoasca is the "least restrictive means" of furthering its interest in compliance with the

Convention, even assuming the Convention applies. Contrary to the dissent, neither the Convention's terms nor the practice of its interpretation is without flexibility when religious and other constitutional countervailing interests are implicated. For example, the CSA provides a mechanism by which the government may protest a scheduling decision made under Article 2 of the Convention. When the government receives notice of a scheduling decision pursuant to Article 2 of the Convention, if the requirements demanded are not met by existing controls, the Secretary of State may "ask for a review by the Economic and Social Council of the United Nations" or "take appropriate action under the Convention to initiate proceedings to remove the drug or substance from the schedules under the Convention or to transfer the drug or substance to a schedule under the Convention different from the one specified in the schedule notice." 21 U.S.C. § 811(c)(3)(C)(iii) & (iv). Article 2 of the Convention creates a process for a signatory state to request a reconsideration of a scheduling decision already made, and in considering that request, the Commission is permitted to take into account "economic, social, legal, administrative and other factors it may consider relevant." Article 2 (1), (5), (6). The availability of these procedures suggests that compliance with the Convention is not wholly inconsistent with the needs of signatory states to tailor some scheduling decisions to local requirements.

The Convention allows signatory states at the time of signature, ratification, or accession to make a reservation for indigenous plants traditionally used by "small, clearly determined groups in magical or religious rites." Article 32(4). To interpret the Convention rigidly, as having no possibility of accommodation for new religious groups (or groups newly arriving in the United States), for which no reservation was sought at the time, raises troubling constitutional concerns of denominational discrimination. *See Olsen*, 878 F.2d 1461. We should not lightly assume this is the correct interpretation of the Convention.

In the case of peyote, as the district court pointed out, 282 F.Supp.2d at 1268, the United States permits the exportation of the substance to Native American Church groups in Canada, despite the fact that exportation of a Schedule I substance for other than scientific or medical purposes would appear to violate the Convention.[6] This suggests that, in practice, there is room for accommodation of the legitimate needs of religious minority groups.

RFRA places the burden on the government to demonstrate that application of the law to the particular religious exercise is the least restrictive means of furthering its interest. As far as the government's argument and the record reveal, the government has undertaken no steps to inquire regarding the status of *hoasca*

---

[6] Peyote use by Native American Church groups within the United States is permitted by an express reservation to the Convention.

or to work with the Economic and Social Council or the International Narcotics Control Board to find an acceptable accommodation. Rather, it has posited an unrealistically rigid interpretation of the Convention, attributed that interpretation to the United Nations, and then pointed to the United Nations as its excuse for not even making an effort to find a less restrictive approach.

To be sure, treaty compliance might well implicate governmental interests beyond the health and safety interests considered above. For example, if it could be shown that if the United States failed to proscribe *hoasca*, another country would seize upon that as an excuse to refuse to proscribe another controlled substance of great importance to our national well-being, that might well constitute a compelling interest. But there is no way to know whether that is so without asking.

The government submitted the affidavit of one State Department lawyer stating in general terms that noncompliance with the treaty would interfere with the ability of the United States to demand cooperation from other nations. But while some level of deference to Congressional and Executive findings is appropriate in the context of foreign relations, this affidavit does not provide any information specific enough to be relevant in assessing the damage that would flow from an exemption for the UDV. Presumably that lawyer did not mean to say that all violations, from the smallest infraction to blatant disregard for the treaty as

a whole, are equally damaging to the diplomatic interests of the United States. He made no mention of whether the International Narcotics Control Board deems hoasca to be within the Convention or whether there may be ways to comply with the Convention without a total ban. Had the government presented an affidavit about the particular harms that this particular infraction would cause, it might be a different matter. *See Ashcroft*, 124 S. Ct. at 2794; *Sable Communications v. FCC*, 492 U.S. 115, 130 (1989) (dismissing conclusory statements that a complete ban on dial-a-porn messages was necessary to protect children because "the congressional record . . . contain[ed] no evidence as to *how* effective or ineffective" less restrictive alternatives would be).

B

Even if UDV were likely to prevail on the merits, the dissent believes this to be one of those rare cases in which the balancing of the equities would dictate that the injunction not issue. *See* Opinion of Murphy, J., at 46. The disagreement rests, I think, on whether the statutory policies and burdens of proof set forth in RFRA should guide our consideration of each of the four preliminary injunction factors – or are relevant only to the first, the probability of success on the merits. I believe Judge Murphy's dissent is wrong to disregard RFRA in balancing the equities. That is not because RFRA implicitly modifies the standards that apply to preliminary injunctions; I agree the normal standards remain in place unless

-33-

Congress clearly manifests an intent to modify them. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). Rather, the point is that the normal standards for injunctive relief require courts to weigh the private and public interests in free exercise on the one hand against the government's interests in regulation on the other, and RFRA is relevant to that weighing. When Congress has expressed its view of the proper balance between conflicting statutory policies, it is incumbent upon the courts to give effect to that view:

> 'Balancing the equities' when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests. When Congress itself has struck the balance, has defined the weight to be given the competing interests, a court of equity is not justified in ignoring that pronouncement under the guise of exercising equitable discretion.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609-610 (1952) (Frankfurter, J., concurring).

By "restor[ing]" the compelling interest test of *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), 42 U.S.C. § 2000bb(b)(1), RFRA expressed Congress's judgment that the free exercise of religion outweighs all but the most compelling governmental interests. *See* 42 U.S.C. § 2000bb-1; *Yoder*, 406 U.S. at 215 ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of

religion."). Once the plaintiff has established a prima facie case, RFRA places on

the government the burden of demonstrating that application of the law is the least

restrictive means of furthering its interest. 42 U.S.C. § 2000bb-1(b).[7] It is not

that RFRA "legislatively overrule[s]" the traditional principle that the moving

party bears the burden of establishing the four preliminary injunction factors. *See*

Opinion of Murphy, J., at 46. Rather, RFRA speaks to the quality of evidence and

nature of the interest that the government must put forward. RFRA makes it clear

that only demonstrated interests of a compelling nature are sufficient to justify

substantial burdens on religious exercise. Mere "equipoise" with respect to not-

necessarily-compelling governmental interests is not enough.

Thus, the dissent is wrong to assume that, with the evidence of the

government's interest in "equipoise," the plaintiff "has not carried its burden of

---

[7]In the free exercise/RFRA context, it is important to note that evidence of a compelling government interest rebuts the plaintiff's prima facie case not by disputing the plaintiff's interest in the religious practice but by outweighing it. Not all burden-shifting regimes share this feature. For instance, in the Title VII context, once a plaintiff is able to show disparate treatment of a similarly situated employee of another race, the burden shifts to the employer to show a nondiscriminatory motive for the differing treatment. To the extent that an employer makes such a showing, it does not present considerations that *outweigh* the plaintiff's interest in a nondiscriminatory workplace; rather, it *undercuts* the plaintiff's claim of discrimination. Thus, if an employer's case for a nondiscriminatory motive is in equipoise, then it follows that the plaintiff's case for discrimination is also in equipoise. In that context, the dissent's view of the consequences of equipoise as to the government's showing is well-founded; in the RFRA context, it seems mistaken.

demonstrating that the third and fourth preliminary injunction factors . . . weigh in its favor."  *See* Opinion of Murphy, J., at 17.  The government's evidence, on this record, demonstrates only that there *might* be some adverse health consequences or risks of diversion associated with UDV's *hoasca* consumption.  *See* Gov't Br. 45 (describing the government's interest as an interest in prohibiting substances that are "just as likely to be dangerous as . . . safe").  But under RFRA, mere possibilities, based on limited evidence supplemented by speculation, are insufficient to counterbalance the certain burden on religious practice caused by a flat prohibition on *hoasca*.  *See United States v. Hardman*, 297 F.3d 1116, 1130 (10th Cir. 2002) (en banc); *Sherbert*, 374 U.S. at 407.

In effect, the dissent attempts to make an end run around RFRA's reinstatement of strict scrutiny by repackaging all of the arguments that would be relevant to the merits (where the presumption of invalidity would clearly apply) as arguments about the equities (where it is disregarded).  That approach is unprecedented.  When the government fails to demonstrate its compelling interest in burdening a constitutional right, courts routinely find that, in the absence of a compelling justification for interference, the balance of harms and public interest also favor protecting the moving party's burdened rights. *See, e.g., Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 576 (2d Cir. 2002) (affirming the grant of a preliminary injunction because the City "*ha[d] not*

-36-

*sufficiently shown* the existence of a relevant law or policy . . . that would . . . justify its actions in dispersing the homeless from the Church's landings and steps" (emphasis added)); *Jolly v. Coughlin*, 76 F.3d 468, 482-83 (2d Cir. 1996) (applying a heightened standard but nevertheless upholding a RFRA-based preliminary injunction because the plaintiff had established a prima facie case and the government had not established that its policy was the least restrictive means of furthering a compelling interest); *Eisenberg ex rel. Eisenberg v. Montgomery County Public Schools*, 197 F.3d 123, 127 n.11, 133 (4th Cir. 1999) (reversing the denial of a preliminary injunction because the school district had not presented evidence sufficient to rebut the strict-scrutiny presumption that race-based decisions are invalid). *See also Stuart Circle Parish v. Bd. of Zoning Appeals*, 946 F. Supp. 1225, 1235-36, 1240 (E.D. Va. 1996) (finding that because plaintiffs demonstrated a substantial likelihood of success on their RFRA claim, their interest in religious freedom tipped the balance of harms and the public interest in their favor); *Luckette v. Lewis*, 883 F. Supp. 471, 483 (D. Ariz. 1995) (balance of harms weighed sharply in favor of prisoner given that his religious exercise was burdened and defendants had not demonstrated a countervailing public interest); *Howard v. United States*, 864 F. Supp. 1019, 1029 (D. Colo. 1994) (in light of likelihood of success, public interest in protecting First Amendment rights outweighed any possible harm to the government); *McCormick v. Hirsch*, 460 F.

Supp. 1337, 1350 (M.D. Pa. 1978), *abrogated on other grounds, see Bakery,*

*Confectionery and Tobacco Workers' Int'l Union, Local 6 v. NLRB,* 799 F.Supp.

507, 511 (E.D. Pa. 1992) ("When the protection of First Amendment liberties are

[sic] involved, little else need be said of balancing the public interest, as

protection of these rights is the most fundamental.").[8]

If there was any doubt before, the Supreme Court's recent opinion in

*Ashcroft v. ACLU,* 124 S. Ct. 2783 (2004), forecloses the dissent's approach. Like

this case, *Ashcroft* involved a preliminary injunction in which the merits were

governed by the compelling interest/least restrictive means test. The issue there

was the constitutionality of the Children's Online Protection Act, ("COPA"),

which requires businesses posting certain sexually explicit content on the web to

require viewers to submit information verifying their age before they could access

the materials. *See id.* at 2789-90. The main question was whether that means of

keeping the content away from children was the least restrictive means, as

compared with other methods (prominently, making internet filtering programs

more readily available to parents). As in our case, there was evidence on both

sides, and substantial factual questions remained about the relative effectiveness

---

[8]The dissent argues that the right at issue in this case is statutory, rather than constitutional, making several of the cases cited above inapposite. Opinion of Murphy, J., at 45–46 n.17. But RFRA dictates that the government must meet the same exacting standard as when it seeks to justify a burden on a constitutional right.

of the two alternatives. *See id.* at 2794. On that record, the Court found that the plaintiffs were likely to succeed primarily because the burden of proof was allocated to the government. *See id.* at 2791, 2793 (noting that movants had no burden to demonstrate the effectiveness of alternative means of serving the government's interest; the government bore the burden of proving that other alternatives were less effective than COPA).

By the dissent's logic, the Court should have gone on to reverse the district court's preliminary injunction on the theory that with respect to the balance of harms and public interest prongs, it was not the government but the plaintiffs who bore the burden of proving that the COPA regime was not the least restrictive means of serving the government's interests. In fact the Court did quite the opposite. In affirming the preliminary injunction, the Court had this to say about the equities supporting the injunction:

> As mentioned above, there is a serious gap in the evidence as to the effectiveness of filtering software. . . . For us to assume, without proof, that filters are less effective than COPA would usurp the District Court's factfinding role. By allowing the preliminary injunction to stand and remanding for trial, we require the Government to shoulder its full constitutional burden of proof respecting the less restrictive alternative argument, rather than excuse it from doing so.

*See id.* at 2794. The Court thus held that even with regard to the balance of harms, the government must "shoulder its full constitutional burden of proof respecting

the less restrictive alternative argument."[9]  *Id.*  Under controlling Supreme Court precedent, therefore, we cannot "excuse" the government from meeting its burden simply by shifting the analysis from the likelihood of success to the equities.

C

Even putting aside any special features of RFRA or strict scrutiny more generally, there is a more basic problem with the dissenters' approach.  While Judge Murphy is correct to insist that UDV carry its burden with regard to each of the four factors of the preliminary injunction test, he underestimates the significance of the likelihood of success on the remaining factors, thereby misconceiving the relationship between the four preliminary injunction factors.  A primary purpose of the balance-of-harms inquiry is to determine the relative cost of an error favoring one side as compared with an error favoring the other.  *See, e.g.*, *Ashcroft*, 2004 WL 1439998 at *9 (noting that "the potential harms from reversing the injunction outweigh those of leaving it in place by mistake"); *Tri-*

---

[9]The dissent complains that this passage "does not relate in any fashion" to the balance of the harms or public interest factors.  Opinion of Murphy, J., at 47. This is not correct.  The Court referred to "important practical reasons to let the injunction stand pending a full trial on the merits."  The first of these was that "the potential harms from reversing the injunction outweigh those of leaving it in place by mistake."  *Ashcroft*, 124 S. Ct. at 2794.  But the principal point is what the Court did *not* do – it did not, as Judge Murphy says we should – treat the plaintiffs as not having met their burden of proof on the balances of equities where the same evidence had been held sufficient to establish that they were likely to prevail on the merits under a compelling interest test.

*State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 358 (10th Cir. 1986) ("In essence, it would be easier to correct a mistake in favor of Tri-State in issuing an injunction than it would be to correct a mistake in favor of Shoshone and Pacific by not issuing it."). It follows that the balance-of-harms inquiry depends in part on the merits inquiry, since the only way of assessing whose harms are likely to be *erroneously* imposed is to judge them in light of the likelihood of success on the merits. Thus, no matter how great the interim harm to UDV if it is prevented from using *hoasca* until the final resolution of this case, that harm must be discounted to the extent that it is likely that UDV will not ultimately prove entitled to use *hoasca*; by the same token, no matter how great the interim harm to the government if it is wrongfully forced to allow the UDV to use and import *hoasca*, that harm must be discounted by the likelihood that UDV will ultimately prevail. *Cf.* Opinion of Seymour, J., at 8-9.

Although not always explicitly, courts commonly evaluate the balance of harms in light of the likelihood of success. *See, e.g.*, *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 & n.2 (7th Cir. 1992); *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 652 (10th Cir. 2004) (downplaying the harm to the defendant because the defendant had not rebutted the plaintiff's *prima facie* case on the merits, and therefore the preliminary injunction required the defendant to do no more than it was legally obligated to do). It may be possible, as the dissent

suggests, for the harm and public interest factors to favor the party likely to lose on the merits so strongly that the (likely) losing party should succeed at the preliminary injunction stage. Such an outcome is highly unlikely, however, when the merits determination hinges on the strength of the governmental interest. In such cases, it is to be expected that the merits and the balance of equities would overlap. If the government's interest is not strong enough to outweigh the plaintiff's interest in religious exercise for purposes of the merits, it is highly unlikely to do so for purposes of the balance of harms.

D

Besides insisting that UDV has not met its supposed burden of disproving the government's interest, Judge Murphy's dissent also suggests several substantive reasons for finding that the balance of harms favors the government. First, he relies on the government's general interest in enforcing the law. *See* Opinion of Murphy, J., at 40–41, *quoting New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351(Rehnquist, Circuit Justice 1977). However, we must not forget that this case involves the intersection of two Acts of Congress of equal dignity: RFRA and the CSA. As a result, the government's interest in complying with the law cuts both ways: the government has no less interest in obeying RFRA than it has in enforcing the CSA. Whether the public interest in enforcing the law favors accommodation under RFRA or strict application of the CSA *depends* on

whether there is a compelling interest that requires strict enforcement of the latter. It would be circular to rely on that interest to establish the government's compelling interest in the first place.

The government also stresses its interest in uniform enforcement of the law and avoiding the burdens of case-by-case management of religious exemptions, raising concerns that if UDV is allowed an exemption in this case, it will make enforcement of the CSA (and the Convention) unworkable by encouraging a host of spurious claims for religious drug use. I find the panel opinion's reasons for skepticism on this front convincing. *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 342 F.3d 1170, 1186 (10th Cir. 2003). In any event, it is most unlikely that those fears will materialize during the pendency of a preliminary injunction. Assuming the government is entitled to enforce the CSA, a final judgment in its favor will serve as adequate discouragement for future claims similar to UDV's. If the government is serious about the dangers, it can always seek expedited treatment of this case on the merits, and prove its case to the district court.

Finally, even when the government is able to demonstrate a compelling interest under RFRA, it remains necessary to establish that there is no other way of furthering that interest that would have less impact on the religious exercise. *See Yoder*, 406 U.S. at 215 (requiring the government's interest to be one "not

otherwise served"); 42 U.S.C. § 2000bb–1(b)(2). Thus, although the parties spend the bulk of their efforts arguing about whether the government has a compelling interest in prohibiting UDV's use of *hoasca*, that is only part of the analysis. In *United States v. Hardman*, when this Court applied RFRA to a statutory scheme that allowed Native American tribe members to possess eagle parts but denied access to other practitioners of Native American religion, the Court en banc held that the government could not prevail without presenting evidence about the effects of alternative, less restrictive approaches on the compelling government interests in question. 297 F.3d at 1132. "[W]e must first determine where along [the continuum of policy alternatives] the government's present solution lies, and where other, less restrictive means would lie." *Id.* at 1135.

This case, like *Hardman*, raises the question of why an accommodation analogous to that extended to the Native American Church cannot be provided to other religious believers with similar needs. As the panel majority noted, the apparent workability of the accommodation for Native American Church peyote use strongly suggests that a similar exception would adequately protect the government's interests here. *See O Centro*, 342 F.3d at 1186. The preliminary injunction issued in this case allows the government some degree of control over UDV's importation, storage, and use of *hoasca*. At least to some extent, then, the preliminary injunction works a compromise, attempting to respond to the

government's legitimate concerns while still allowing UDV to continue its religious activity.  It is incumbent on the government to show why no such compromise regime could adequately serve its interests.

E

All told, this is the unusual case in which the plaintiff not only prevails on each of the four preliminary injunction factors, but does so with sufficient clarity that a preliminary injunction is warranted even though it would disturb the status quo.  The dissent does not challenge that the plaintiff would suffer serious and irreparable injury from continued prohibition of its religious sacrament. With the burden on the government to prove that its interest in enforcing the CSA against religious *hoasca* use is compelling but the evidence in support of that interest no better than "in equipoise," the plaintiff has also demonstrated a likelihood of success on the merits.  The same state of the record demonstrates conclusively that the plaintiff prevails on the other two factors.  With a proven interest of high order on one side, and mere uncertainty, or "equipoise," on the other, the balance of equities is plainly in the plaintiff's favor.  And in light of Congress's determination that the public interest is served by accommodating the free exercise of religion except in cases of a proven compelling governmental interest, the plaintiff prevails on the "public interest" prong as well.

In conclusion, courts should issue preliminary injunctions that disturb the status quo only when the traditional balance is strongly in the plaintiff's favor, but on this record, plaintiff UDV has satisfied that demanding test.

No. 02-2323; *O Centro Esprita Beneficiente Uniao Do Vegetal v. Ashcroft*

**HARTZ,** Circuit Judge, dissenting:


I dissent, with great respect for the opinions that hold otherwise.

I join Part I of Judge Murphy's dissent and Part I of Judge McConnell's concurrence. I agree that the status quo is an important consideration and that Judge Murphy has properly analyzed where the status quo lies in this case. I should add, however, that, as with all balancing tests, our form of words in expressing the test is of minimal utility. District courts will continue to consider the factors we list and reach the result they believe to be equitable; and we, observing proper deference, will generally affirm.

In applying the balancing test, I believe that the principal reason for reversing the preliminary injunction is the unlikelihood that UDV will ultimately prevail on the merits. Applying pre-<u>Smith</u> Supreme Court precedent (as RFRA requires), it is likely that the ultimate determination will be that there is a compelling interest in uniform application of the Controlled Substances Act. <u>See</u> <u>Employment Div. v. Smith</u>, 494 U.S. 872, 905 (1990) (O'Connor, J., concurring). Moreover, it is even more likely to be determined that there is a compelling interest in full compliance with the 1971 United Nations Convention on

Psychotropic Substances, which would be violated by permitting the UDV's use of hoasca.  See O Centro Espirita Beneficiente Uniao De Vegetal v. Ashcroft, 314 F.3d 463 (10th Cir. 2002).